Leon HAMPTON, Jr., Appellant,

v.

The STATE of Texas.

No. 499–01.

Court of Criminal Appeals of Texas.

Sept. 25, 2002.

Rhett Hoestenbach, Odessa, for Appellant.

Jeffrey L. Van Horn, First Assist. St. Att., Austin, for the State.

## OPINION

COCHRAN, J., delivered the unanimous opinion of the Court.

When police officers took appellant, a juvenile, into custody, they told his mother that they were doing so because he had absconded from juvenile probation. The next morning, without re-establishing contact with appellant's mother, an Odessa officer questioned appellant about a March 1999 murder. Appellant gave a videotaped statement in which he admitted to killing the victim. Because we find that the police officer properly notified appellant's mother "of the reason for taking the child into custody," as required by Family Code section 52.02(b), he was not also statutorily required to tell her that he suspected her son of committing a murder or to notify her again before questioning appellant. In a separate issue, we also find that the court of appeals erred in confusing the standard for reversal for *Brady*[1] error with the standard for reversal for constitutional error under Tex.R.App. P. 44.2(a).[2]

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. We granted the following three grounds for review:

 1. The Court of Appeals erred in holding that a juvenile's videotaped statement is subject to suppression because the juvenile's parents were not notified of a change in the reason for which he was being detained prior to his making of the statement.

 2. The Court of Appeals erred in holding that a juvenile's confession is subject to suppression because of a delay in notifying

We therefore reverse the El Paso Court of Appeals' decision that the officer violated section 52.02(b) and therefore illegally obtained appellant's confession. *Hampton v. State*, 36 S.W.3d 921, 924 (Tex.App.-El Paso 2001). We remand the case to the court of appeals for it to determine whether appellant has demonstrated that the State's failure to timely produce a police officer's supplementary report was material and thus created "a probability sufficient to undermine ... confidence in the outcome of the proceeding." [3]

## I.

On March 18, 1999, Jarvis Preston and his sister, Lashara Preston, were watching TV when they heard gunshots outside Lashara's apartment at La Promesa Apartments in Odessa, Texas. Two or three minutes later, they saw someone run past her back window in the alley. Jarvis recognized that person as the appellant, "Tweet." [4] Appellant was standing on the back porch and said, "Open the door for me." Lashara did not want appellant to come inside, but Jarvis considered appellant "just like a home boy," and so he asked Lashara for the keys to her car and offered to drive appellant home. Appel-

lant told Jarvis that he thought he had shot somebody in self-defense. Appellant and Jarvis then spent the rest of the night driving around.

Meanwhile, police officers responded to a 911 call, came to the apartment complex, and found the body of William Nance, who had been shot to death. During their investigation, the officers obtained information which focused suspicion on appellant as the shooter. Four days after the murder and upon discovering that appellant was a probation absconder, Detective McCann and other officers arrested appellant at his friend's apartment. When appellant heard police officers at the front door, he ran out the back, but the officers caught him.

Appellant's mother, Deborah Jackson, arrived at the friend's apartment while the Odessa police were taking her son into custody. She asked Det. McCann why they were taking appellant into custody and he told her that they were picking him up for a probation violation—he was an absconder from juvenile probation. She told Det. McCann that appellant was a juvenile.[5]

his parents of a change in the reason for which he was being detained, in the absence of any showing of a causal connection between the delay in notification and the making of the videotaped statement.

3. The Court of Appeals employed an improper standard for reviewing a potential *Brady* violation by replacing the third prong of the *Bagley* test with the harmless error standard of Rule 44.2(a).

**3.** *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim.App.2000); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex.Crim.App.1992).

**4.** Apparently the nickname "Tweet" caused some confusion. One eyewitness to the shooting, John Cooper, testified that he saw appellant, known as "Tweet," shoot Mr.

Nance. During the investigation, another witness, Andrea Michelle Travioli, told officers that she also saw "Tweet" shoot Mr. Nance, but that "Tweet" was the nickname for Anthony Jackson. When police learned that Mr. Jackson was in jail at the time of the shooting, Ms. Travioli admitted that she had been threatened and told to identify the wrong person as the shooter.

**5.** Under Texas law, a person who is not yet seventeen is a juvenile and police must deal with that person according to the terms of the Juvenile Justice Code which contains specific procedural protections, even though that person may later be certified to stand trial in an adult district court. Upon his seventeenth birthday, a person is an adult for purposes of the Texas criminal justice system, including all arrest and police interrogation purposes,

Det. McCann, mistakenly believing that appellant was seventeen because he had booking photos and information from the Sheriff's Department that appellant had previously been arrested as an adult, drove him to the Odessa police station instead of the Ector County Youth Center. Appellant subsequently admitted to the detective that he had lied about his age when he was previously arrested by the Sheriff's Department and that he was really just sixteen. Det. McCann called the Youth Center to verify that appellant was indeed still a juvenile. Meanwhile, Det. McCann asked appellant several times if he wanted to give a statement at some time, although he did not ask him any questions. At first appellant was very "vocal and profane," but he soon "settled down" and said he would give a statement. Once appellant's age was verified, Det. McCann drove appellant to the Youth Center at about 12:30 a.m. and left him in the center's custody.

Det. McCann returned the next morning, was permitted to check appellant out of the juvenile detention center, and took him back to the police station, where a magistrate advised appellant of his rights and asked him whether he wanted to waive those rights and talk to Det. McCann. Appellant did. Both appellant's interview with the magistrate and his two hour interview with Detective McCann were videotaped and transcribed. Appellant stated that he had killed Mr. Nance, but claimed that he shot in self-defense.

Appellant explained that he had been at an apartment with several people that night, talking and watching TV while they smoked crack cocaine. At about 4:00 a.m., appellant went outside to visit another friend and saw Mr. Nance. Appellant stated that Mr. Nance wanted some dope

and he mistakenly thought appellant sold drugs. When appellant told Mr. Nance that he was not a drug dealer, Mr. Nance became hostile and threatening. As Mr. Nance started toward appellant, Nance slipped and appellant pulled his gun out of his pants and cocked it. The victim hit appellant's hand and the gun "went off." According to appellant, he started to run away, but Mr. Nance kept coming after him and so he shot twice more. He then ran back to the apartment where he had been watching T.V., but his friends refused to let him come in. They threw his jacket out to him, and he then ran to the apartment where Jarvis Preston and his sister were.

While Det. McCann was questioning appellant at the police department, Ms. Jackson called the Youth Center to see how appellant was doing. She was told that a police officer had checked him out of the facility. She then called the Odessa police department and discovered that an officer was questioning her son about a murder.

Appellant filed a pretrial motion to suppress his videotaped confession. He claimed, inter alia, that Det. McCann did not notify appellant's mother that, although appellant was taken into custody as a juvenile probation absconder, the police also suspected him of killing Mr. Nance. After hearing testimony, the trial judge denied the motion to suppress and admitted appellant's videotaped statement at trial.

Other evidence offered by the State at trial included the eyewitness testimony of John Cooper,[6] who testified that he was "smoking crack" at a friend's apartment. Looking out the upstairs window, he had

even though he may already be under the supervision of the juvenile justice system.

6. By the time of the trial, Mr. Cooper was in prison for a probation violation on delivery of cocaine charge.

seen appellant, whom he knew as "Tweet," and another man outside arguing. After he turned away from the window, he heard a gunshot. When he looked back out the window, he saw a man run across the street and fall down. He also saw appellant with his arm extended and heard several more shots. Mr. Cooper said that appellant was the only other person in the area.

Fourteen-year-old Anthony Tuda testified that he was asleep in his bed at La Promesa Apartments at about 4:20 a.m. on March 18th when he heard a gunshot. He got up and looked out his window and saw "the one that got shot, he, like, struggled across the street and just fell down." He said he saw three people in all, the victim and two other people. Anthony Tuda explained that, at first, he saw only the shooter and his victim, but then after the shooter ran away, he thought he saw someone else drive off in a pick-up truck. He did not recognize any of the people. He called 911.

Andrea Travioli testified that she was at the apartment at La Promesa that night with appellant. He left, she heard shots, then, shortly thereafter, appellant banged on the door and said he needed his jacket because he "need[ed] to get the hell out of here." Jermaine Session testified that appellant came to his apartment the next morning and told him he had argued with Mr. Nance and shot him. Jason Yielding testified that appellant later came to his apartment and asked him for a ride into the country. Jason did so and saw appellant throw a sack out of the window at a location where officers later recovered parts of a gun of the same type used to kill Mr. Nance.

After all of the State's witnesses testified, appellant's attorney told the judge that he had just discovered that the prosecutor had a supplemental police report which he had not previously seen.[7] He said that this report, prepared by Sgt. Roberts of the Odessa Police Department, contained potentially exculpatory information, namely the first names of two girls who had lived in the apartment complex when the shooting occurred (but who had since moved). Appellant's attorney said that the girls told police officers shortly after the murder that they had seen two black males running away from the shooting scene, one of who was Jarvis Preston, appellant's friend who drove him away from the murder scene.[8] Appellant re-

7. The prosecutor explained that the State had an open file policy and that both appellant's attorney and she thought that the defense had been provided with everything in the file while the case was still in juvenile court. Appellant's attorney had come to her office on several occasions to review materials, but both she and appellant's attorney agreed that he did not have a copy of this supplemental report. The trial judge found that the prosecution had not "withheld" this report from appellant, but that appellant's attorney was nonetheless entitled to see it.

The trial judge stated that he did not have a copy of the report, but he did ask appellant's attorney: "Is the only significant thing in there the testimony or statement by two girls that Jarvis Preston was seen running from the scene?" Appellant's attorney responded,

"That's pretty much the gist of it, Your Honor." There is no copy of this supplementary report in the appellate record, and thus we are unable to determine what, if anything, it might contain beyond the brief description given by appellant's attorney.

8. Although appellant's attorney was not aware of the first names of the two girls until mid-trial, he was aware that radio broadcasts immediately after the shooting alleged that two black males, one of them Jarvis Preston, had been seen running down the alley behind the Preston apartment. Appellant cross-examined Mr. Preston, who testified for the State, extensively about this radio report and suggested that Mr. Preston left town as a result of these reports-because he was worried about being accused of the crime himself.

quested a continuance for his investigator to try to track down the two missing girls. The trial judge denied this request and then appellant asked for a mistrial which was also denied. Appellant did not file a motion for new trial or request a hearing to present further evidence relating to this issue.

A jury convicted appellant and sentenced him to 35 years imprisonment. The El Paso Court of Appeals, finding that: 1) appellant's videotaped statement was taken in violation of section 52.02(b); and 2) the State's failure to disclose potentially exculpatory material was harmful, reversed the conviction and ordered a new trial. We granted the State Prosecuting Attorney's petition for review.

## II.

Section 52.02(b) of the Texas Family Code requires a person who takes a juvenile into custody to promptly notify the child's parent and appropriate juvenile authorities of the detention and to state his reason.[9] The issue in this case is: What does the phrase "a statement of the reason for taking the child into custody" mean?

We apply the traditional standards of statutory construction to analyze whether Section 52.02(b) requires police officers to inform a parent, not only of the "reason the child [has been] taken into custody," but also: (1) whether they harbor any suspicions of other criminal conduct; and (2) whether they must renotify a parent or guardian before questioning the child about the same or a different criminal offense. We look solely to the plain language of the statute for its meaning unless the text is ambiguous or application of the statute's plain language would lead to an absurd result that the Legislature could not possibly have intended.[10]

Under the plain language of Section 52.02(b)(1), an officer must inform a child's parent of "the reason" for taking the child into custody. That is, police must provide a parent with the legal justification for the officer's action.[11] Appellant argues that Section 52.02(b) "was adopted for children to have a knowing and intelligent advisor when faced with the intimidating prospect of law enforcement questioning." Section 52.02(b), on its face, does not require police to renotify parents or custodians concerning their suspicions of criminal conduct other than that for

**9.** Section 52.02(b) provides:

A person taking a child into custody shall promptly give notice of his action and a statement of the reason for taking the child into custody, to:
(1) the child's parent, guardian, or custodian; and
(2) the office or official designated by the juvenile court.
TEX. FAM.CODE § 52.02(b) (Vernon Supp.2002).

**10.** *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991).

**11.** In *In re S. R. L.*, 546 S.W.2d 372 (Tex.Civ. App.—Waco 1976, no writ), the Waco Court of Appeals rejected a contention similar to appellant's:

Appellant contends that [Section 52.02(b)] was violated because the detective failed to

tell the father that his reason for taking appellant into custody was to take a confession, and that the confession was therefore inadmissible. We disagree. The evidence shows that the reason appellant was taken into custody was the criminal offense involving the coin-operated machine. The statute was satisfied when the detective told the father about this charge against appellant.
*Id.* at 373. At the time S. R. L. was taken into custody, the State had filed a motion to revoke probation alleging that he had committed the offense of theft from a coin-operated machine. *Id.* Based on *S. R. L.*, Professor Dawson concludes that " 'Reason for taking the child into custody' means the offense for which he was arrested, not the purpose of the officer in making the arrest." Robert O. Dawson, TEXAS JUVENILE LAW 301 (5th ed.).

which the child has been taken into custody. This statute uses the singular; parents must be told of "the reason" for taking the child into custody. The statute does not say that a parent must be informed of "the legal reason for taking the child into custody, and any other suspicions." Both the plain words and the plain meaning of Section 52.02(b) are directed toward informing the parent of his child's whereabouts and the legal justification for taking him into custody.[12] Interpreting the statutory phrase "a statement of the reason for taking the child into custody" according to its plain meaning does not lead to an absurd result, nor does appellant contend otherwise.

In this case, there is no dispute that Det. McCann complied with Section 52.02(b)(1) by informing appellant's mother that he was taking appellant into custody because he was a probation absconder. However, the court of appeals assumed that, even if law enforcement authorities initially comply with Section 52.02(b)(1) by notifying a parent and giving that person an accurate statement of their legal reason for taking a child into custody, they must notify the parent again before questioning the juvenile about any other offense. The court of appeals stated:

Although police initially informed Hampton's mother that he was being taken into custody on a juvenile absconder warrant, they did not tell her of the murder charge [sic][13] until Hampton was in the process of making his statement, and then only when she called authorities to find out about her son's status.[14]

Clearly, when Det. McCann took appellant into custody on the probation absconder warrant, he wanted to question appellant about Mr. Nance's murder. That fact is not in dispute. But we find no statutory requirement that law enforcement officers must renotify a juvenile's parents before questioning him, whether on the same or a different offense, once they have initially complied with Section 52.02(b)(1). The triggering event for purposes of parental notification is the act of taking a juvenile into custody. It is not the subsequent act of questioning the juvenile. The "reason" for taking the child into custody is the officer's legal justification, not his subjective motives.[15]

Appellant argues that the court of appeals found that Det. McCann failed to notify the appropriate juvenile authorities that appellant had been taken into custody

12. The various legal justifications for taking a child into custody are set out in Family Code Section 52.01(a). One of those justifications is a "directive to apprehend" issued by the juvenile court under Section 52.015. A juvenile probation absconder warrant is one such "directive to apprehend."

13. There is no evidence in the record that appellant was "charged" with murder until some time after he gave his videotaped statement. The record does reflect that appellant was indicted for murder on June 25, 1999. There is nothing in the record to indicate when a petition alleging murder was filed in the juvenile court.

Appellant was "suspected" of having committed a murder at the time Det. McCann took him into custody, but that was not the

reason Det. McCann took him into custody. Det. McCann testified: "He wasn't locked up for the murder the night before. He was locked up for being an absconder." He repeatedly testified that appellant was not under arrest as a murder suspect.

14. *Hampton*, 36 S.W.3d at 924.

15. *See In re S. R. L.*, 546 S.W.2d at 373; *cf. Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (when traffic violation itself constitutes an objectively reasonable basis for stop and detention, any subjective motive on the part of officers is irrelevant); *Walter v. State*, 28 S.W.3d 538, 543 (Tex.Crim.App.2000).

as an absconder from juvenile probation, as was required under Section 52.02(b)(2). The record, however, reflects that as soon as appellant told Det. McCann that he really was a juvenile, not an adult, the detective called the Ector County Youth Center to verify appellant's age.[16] Once he verified appellant's age, Det. McCann told the juvenile intake officer that he was bringing appellant to the Center as a probation absconder. Det. McCann then promptly delivered appellant to the Youth Center.

 A reviewing court must evaluate the historical facts in the light most favorable to the trial court's ruling.[17] The record facts in this case, viewed in the light most favorable to the trial court's ruling, support the trial court's implicit factual finding that Det. McCann promptly notified appellant's mother and the juvenile authorities of appellant's detention and gave each "a statement of the reason" for taking appellant into custody. For mixed questions of law and fact, however, a reviewing court uses a *de novo* standard of review.[18] The meaning of words and phrases used in a statute is a question of pure law; and the application of the scope of a statute to specific, undisputed historical facts is a mixed question of law and fact. Both of these matters are reviewed *de novo* at each appellate level. Under that standard, we find that Det. McCann complied with the requirements of Section 52.02(b), in that he promptly notified both appellant's mother and the appropriate ju-

venile authorities that he had taken appellant into custody and informed them of his reason for doing so. We therefore sustain the State's first ground for review.

Finding no violation of Section 52.02(b), we need not address whether appellant has demonstrated a causal connection between a violation of that statute and the making of his videotaped statement. Therefore, we dismiss the State's second ground for review.

### III.

In a separate ground for review, the State argues that the court of appeals employed an improper standard for reviewing a potential *Brady* violation by replacing the third prong of the *Bagley* test with the constitutional harmless-error standard of Rule 44.2(a). In its opinion, the court of appeals stated that: "Although this [three-pronged test for reversal under *Brady* ] predates our present TEX.R.APP. P. 44.2, because *Brady* violations implicate constitutional rights, we believe the result under either formulation of the harm test is the same." [19] Appellant argues that the State has misconstrued the lower court opinion, and that the court of appeals did conduct a separate Rule 44.2(a) harm analysis for constitutional error.

 The court of appeals, after noting that Sergeant Roger's supplementary report contained the first names of two witnesses who said they had seen two black males running away from the shooting scene, one of whom was Jarvis Preston,

---

16. Det. McCann testified that any delay in taking appellant to the juvenile detention facility was because appellant had previously lied about his age to the Sheriff's Department and Det. McCann needed to verify his age with the juvenile facility before taking any further action.

17. *Contreras v. State,* 67 S.W.3d 181, 185–86 (Tex.Crim.App.2001).

18. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997); *see also State v. Terrazas,* 4 S.W.3d 720, 725–26 (Tex.Crim.App.1999).

19. *Hampton v. State,* 36 S.W.3d 921, 926 (Tex.App.—El Paso 2001).

concluded that, had the defense timely known this information, appellant "might well have chosen a different strategy which could have exonerated him."[20] The reviewing court did not elaborate on how the defensive strategy might have differed or what would be the probable impact of discovering the names of these two possible witnesses at an earlier time. The court then concluded: "All three *Brady* harm elements are satisfied, as is the harm requirement of Tex.R.App. P. 44.02(a)."[21] From its opinion, we cannot determine whether the court of appeals applied the standard for *Brady* error rather than an inappropriate general harmless error standard for reversal for constitutional error. In both *Brady* and *Bagley*, the Supreme Court explicitly rejected the use of a harmless error rule when the prosecutor fails to disclose certain evidence favorable to the accused because, under that rule, every nondisclosure would be treated as error, "thus imposing on the prosecutor a constitutional duty to deliver his entire file to defense counsel."[22] Although reversible error under *Brady* will always constitute reversible error under Rule 44.2(a), the converse is not true.

 The three-pronged test for reversible error for a *Brady* violation is en-

tirely different from the constitutional harmless error standard set out in Tex. R.App. P. 44.2(a). To find reversible error under *Brady* and *Bagley*, a defendant must show that:

1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith;

2) the withheld evidence is favorable to him;

3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.[23]

Under *Brady*, the defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure.[24] "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."[25]

 In the present case, the court of appeals did not analyze the prosecutor's failure to timely disclose the existence of the supplementary report[26] in light of all

---

**20.** Although there would be some additional impeachment value in presenting the live testimony of two objective witnesses that they had seen two men running from the scene, appellant did repeatedly cross-examine Mr. Preston about the contemporaneous reports that unnamed witnesses had seen two black males, one of them being Mr. Preston, run away. *See* note 8 *supra.*

**21.** 36 S.W.3d at 926.

**22.** *Bagley,* 473 U.S. at 680, 105 S.Ct. 3375 (citing *Agurs,* 427 U.S. at 111–12, 96 S.Ct. 2392).

**23.** *See Ex parte Richardson,* 70 S.W.3d 865, 870 (Tex.Crim.App.2002); *Ex parte Kimes,* 872 S.W.2d 700, 702–03 (Tex.Crim.App. 1993).

**24.** *See Bagley,* 473 U.S. at 682, 105 S.Ct. 3375; *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Amos v. State,* 819 S.W.2d 156, 159–60 (Tex. Crim.App.1991); *Turpin v. State,* 606 S.W.2d 907, 916 (Tex.Crim.App.1980).

**25.** *Agurs,* 427 U.S. at 109, 96 S.Ct. 2392; see also *Stone v. State,* 583 S.W.2d 410, 415 (Tex. Crim.App.1979).

**26.** When the issue is the failure to *timely* disclose, the defendant must show that had the State disclosed the potentially exculpatory material *earlier,* there is a reasonable probability that the outcome of the proceeding would have been different. *Wilson v. State,* 7 S.W.3d 136, 146 (Tex.Crim.App.1999) (stating that when defendant had been aware of other

the other evidence adduced at trial. In particular, the court did not discuss the report's materiality in light of appellant's own videotaped statement admitting that he alone had shot Mr. Nance. This omission is entirely understandable because the court of appeals had previously held that appellant's videotaped statement should not have been admitted. The reviewing court's analysis upon remand should consider this properly admitted evidence as well as the remainder of the evidence, including the testimony of John Cooper, Anthony Tuda, Andrea Travioli, Jermaine Session, and Jason Yielding.

Usually, a determination concerning the materiality prong of *Brady* involves balancing the strength of the exculpatory evidence against the evidence supporting conviction.[27] Sometimes, what appears to be a relatively inconsequential piece of potentially exculpatory evidence may take on added significance in light of other evidence at trial. In that case, a reviewing court should explain why a particular *Brady* item is especially material in light of the entire body of evidence.[28]

Therefore, we reverse the court of appeals' judgment, uphold the trial court's admission of appellant's videotaped statement, and remand the case to the court of appeals to analyze the materiality of the prosecutor's failure to timely produce Sgt.

evidence showing that defendant's colleague had a motive to murder victim, delayed disclosure did not prejudice him).

27. See *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375; *Lagrone v. State*, 942 S.W.2d 602, 615 (Tex.Crim.App.1997) (failure to disclose victim's statement that his mind "wandered" at time of offense under *Brady* not "material" when statement was made several days after crime, victim had identified defendant by his voice based on prior relationship, and other witnesses identified defendant as murderer); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex.

Rogers' supplementary report under the standards set out above.

Crim.App.1992) (noting that "a verdict which is only weakly supported by the record is more likely to be affected by [*Brady*] error than a verdict which is strongly supported").

28. See, e.g., *Ex parte Richardson*, 70 S.W.3d 865, 871–73 (Tex.Crim.App.2002) (when withheld *Brady* material seriously undermined credibility of State's star witness, defendant demonstrated materiality and probability that jury would not have convicted him had six police officers testified to her reputation for untruthfulness).