2) Caption, civil cases



COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



LEON HAMPTON, JR.,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-00-00045-CR



Appeal from the


244th District Court


of Ector County, Texas 


(TC# C-27,505)


O P I N I O N



 This case is on remand from the Court of Criminal Appeals. See Hampton v. State,
86 S.W.3d 603 (Tex. Crim. App. 2002). Leon Hampton, Jr. who at the time of his arrest
was a juvenile, appeals his murder conviction. Upon our first consideration of this
appeal, we reversed, holding that in failing to notify his parent that Hampton was being
questioned on suspicion of murder, the police had violated Tex. Fam. Code Ann. § 52.02
(b)(1), and therefore his videotaped statement should have been excluded. Hampton v.
State, 36 S.W.3d 921, 924 (Tex. App.--El Paso 2001). The Court of Criminal Appeals
reversed on that issue. In addition, on that issue, we found that by failing to notify the
office or official designated by the juvenile court, the police had violated Tex. Fam.
Code Ann. § 52.02(b)(2). Hampton, 36 S.W.3d at 924. That ground for reversal was not
challenged by the State nor addressed by the Court of Criminal Appeals.

 The high court remanded for further consideration of Hampton's second issue on
appeal, concerning the prosecutor's failure to timely disclose Brady evidence. Hampton,
86 S.W.3d at 613. Applying the standard for assaying Brady violations, we find that there
was not a reasonable probability that the undisclosed evidence would have changed the
outcome of the trial. We therefore affirm.

Status of videotaped statement upon remand


 We begin by facing a conundrum. The Court of Criminal Appeals has remanded
this case to us with the instruction that, in examining the Brady violation, "[t]he
reviewing court's analysis upon remand should consider this properly admitted evidence
[the videotaped statement] as well as the remainder of the evidence . . . ." Hampton, 86
S.W.3d at 613. In reviewing our earlier opinions and the briefs in this case, however, we
perceive a problem with considering the videotaped statement as properly admitted
evidence, even in light of that court's finding that the police complied with the Family
Code in giving Hampton's mother a reason for detaining him.

 Hampton raised an independent argument for suppressing the videotaped
statement, and we sustained that ground in our first opinion. The State did not raise that
issue in its petition to the Court of Criminal Appeals, nor did that court discuss the ground
in its opinion finding the videotaped statement admissible. We find ourselves, then, in a
situation where we have sustained two independent reasons for excluding a defendant's
statement, and although one has been overturned by the higher court, the second was
neither challenged by the State nor discussed by the court. This requires us to examine
our jurisdiction on remand from the Court of Criminal Appeals.

 The courts of appeals generally enjoy broad jurisdiction following remand from
the Court of Criminal Appeals. Carroll v. State, 101 S.W.3d 454 (Tex. Crim. App. 2003), 
overruling Williams v. State, 829 S.W.2d 216 (Tex. Crim. App. 1992); Adkins v. State,
764 S.W.2d 782, 784 (Tex. Crim. App. 1988); Johnson v. State, 975 S.W.2d 644, 647
(Tex. App.--El Paso 1998, pet. ref'd). After a case has been remanded by the Court of
Criminal Appeals, the jurisdiction originally granted to the court of appeals by
constitutional and statutory mandate is fully restored. Adkins, 764 S.W.2d at 784. "[T]he
courts of appeals are not limited on remand to deciding the pertinent point of error based
solely on the explicit basis set out by [the Court of Criminal Appeals] . . . ." Carroll, 101
S.W.3d at 459. Here, the Court of Criminal Appeals instructed us to reconsider the Brady
issue in the following language:

 In the present case, the court of appeals did not analyze the prosecutor's
failure to timely disclose the existence of the supplementary report in light
of all the other evidence adduced at trial. In particular, the court did not
discuss the report's materiality in light of appellant's own videotaped
statement admitting that he alone had shot Mr. Nance. . . . The reviewing
court's analysis upon remand should consider this properly admitted
evidence as well as the remainder of the evidence . . . . Hampton, 86
S.W.3d at 612-13.


We do not question the high court's ability and duty to correct our errors, and we certainly
bow to its determination that the officer properly notified appellant's mother of the reason
for taking the child into custody, and therefore Hampton's videotaped interview could not
have been excluded on that theory. This does not assist us, however, in deciding how to
treat the failure of the State and the high court to address the second challenge Hampton
raised on this issue: that the police did not give notice and the reason for taking the child
into custody to the office or official designated by the juvenile court. Hampton, 36
S.W.3d at 924. We sustained Hampton's first point of error on both independent grounds. 
Id.

 We therefore cannot agree that the videotaped statement was properly admitted
evidence, as the State waived its opportunity to challenge our determination that the
videotape should have been excluded because it was the result of a custodial interrogation
that did not comply with Tex. Fam. Code Ann. § 52.02(b)(2). For this reason, we
respectfully decline to consider the videotape in complying with the Court of Criminal
Appeals instruction that we reconsider the Brady violation for materiality.

Reversible error for Brady violation


 In remanding, the Court of Criminal Appeals has instructed us to analyze the
prosecutor's failure to timely disclose Brady evidence in light of all the evidence adduced
at trial, including Hampton's statement that he shot the victim, as well as the testimony of
various witnesses. We will endeavor to do so. Under the three-pronged test for
reversible error for a Brady violation, Hampton must show that:

 (1) the State failed to disclose evidence, regardless of the prosecution's
good or bad faith;


 (2) the withheld evidence is favorable to him;


 (3) the evidence is material, that is, there is a reasonable probability that had
the evidence been disclosed, the outcome of the trial would have been
different. 


Hampton, 86 S.W.3d at 612. Neither the first or second prongs are disputed; the evidence
was withheld, and it was favorable. As to the third prong, materiality, the defendant must
show that in light of all the evidence, it is reasonably probable that the outcome of the
trial would have been different had the prosecutor made a timely disclosure. The mere
possibility that an item of undisclosed information might have helped the defense, or
might have affected the outcome of the trial, does not establish "materiality" in the
constitutional sense. Id. (quoting U.S. v. Agurs, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 49
L.Ed.2d 342 (1976)). The evidence in question was a supplementary police report
mentioning two witnesses who stated they had seen two black males fleeing the shooting
scene, one of whom was Jarvis Preston, who testified for the State. Hampton argues that
he should have received a continuance to locate and interview the two witnesses, which
may have resulted in choosing a different defense strategy. See Hampton, 36 S.W.3d at
925.

Evidence presented at trial

 We therefore examine the evidence presented at trial to determine the materiality
of the undisclosed evidence.

 Clara May Nance testified that she was the mother of Steve Nance, the shooting
victim. On March 17, 1999, she accompanied Nance to his lawyer's office, where he
received $9,600 cash as part of his divorce settlement. Later, her son David found all but
about $600 of that money hidden in her garage. Her son Steve had problems with drugs
and alcohol. On the night of March 17, she drove Steve to Shot Guns, a bar.

 Anthony Tuda, fourteen years old, testified that he lives in La Promesa
Apartments. Around 4:20 a.m., after he had been asleep several hours, he heard two
gunshots. He went to his window and saw either two or three people (his statements were
inconsistent on this point). He saw one person, who apparently had been shot, struggle
across the street and fall down. He told the police that he saw two black men, but
acknowledged that the victim was a white man. He saw the shooter with his hand
extended, and he saw a gun.

 Tamara Lynn McDonald testified that she lives at the La Promesa Apartments. 
She had visitors the night of March 17, 1999, including Leon Hampton, the defendant,
who before that night she had only known as "Tweet." Also at her apartment that night
were Miguel "Monk" Preston, Brenda, Meghan, LaConey Taylor, and John Cooper. 
Hampton had come to her apartment around 2 a.m., looking for Jermaine, saying
something about getting a "strap," which meant he was looking for a gun. She heard
gunshots that night, but did not see anything. She had seen Steve Nance around, but did
not know him by name. La Promesa is a housing project, and there is regular drug
activity there. She knew Nance to have an aggressive and violent nature. She had seen
Leon Hampton wearing a comb or pick in his hair. 

 Meghan Slater testified that she was at Tamara McDonald's apartment the early
morning of March 18, 1999. Tammy, Tweet, Monk, and Brenda were there taking drugs
and drinking. She heard four gunshots around 2:45 or 3 a.m. Tweet was not inside the
apartment at that time, he had left alone five to ten minutes before. She heard someone at
the back door after the shooting. Tammy and Monk would not let the person in. She did
not see who it was. Tweet had been wearing a blue pick in his hair that night. She did
not see anything at the time of the shooting.

 John Cooper, who at the time of trial was in prison for delivery of cocaine, was at
La Promesa on March 18, 1999 in Tammy's apartment. He was smoking crack when he
heard gunshots. After the first shot, he looked out the window and saw Nance run across
the street and fall. He saw Tweet out there too. He saw Tweet's arm extended like he
was "popping off . . . shots." He saw the two men having a conversation directly before
the shooting.

 Lashara Preston testified that she lived at La Promesa Apartments on March 18,
1999. That night, she heard three gunshots as she was watching television with her
brother, Jarvis Preston. She saw someone run by the window, but could not tell who it
was. Tweet came to her back porch after the shots were fired, but she would not let him
in. Tweet left with Jarvis in Jarvis's car. She went to get her brother because she did not
want him involved. She had never seen Nance fight, but she knew him as "talking mess." 
La Promesa is known for drug activity, and crack is available for sale there if one finds
the right person. Miguel "Monk" Preston is also her brother.

 Jarvis Preston testified that he was in his sister's house watching television when
he heard shots. Someone ran by the window, then Leon Hampton came to the back
porch. He was on the back porch two or three minutes after the shots. Jarvis told his
sister he was going to take Hampton home. Hampton told Preston as they were leaving,
"man, I think I shot somebody. . . . [T]hat dude just kept trying to rush me, jump me and
kept rushing me. . . . I was trying to pull out my gun and he was rushing me. And when I
pulled out my gun, he slapped it and the gun went off. . . . I kept on backing up, trying to
get him off of me, and just started shooting and running." That was the only conversation
he and Hampton had about the shooting. Preston volunteered to make a statement
because he had heard some people were saying they saw two suspects running down the
alley and he was worried that someone might put him at the shooting. He was like family
with Leon Hampton, they had been together earlier that night at the movies. He had seen
Hampton with a .25 handgun around 10 p.m. that night.

 Andrea Travioli testified that she was at Tammy's apartment that night. Tweet
was outside when they heard shots. He was the only one who had been there and left the
apartment. She heard Tweet's voice at the back door after the shooting saying, "I need
my jacket." Monk opened the door and gave him the jacket. She saw Tweet and Jarvis
leave, running. She and her friends were drinking and drugging that night before the
shooting. Andrea was nervous because Leon said he was "bouty-bouty," which meant he
was taking care of business. He said this about 2:30 a.m. She initially told the police that
"Tweet" was Anthony Freeman, who also goes by that nickname. She picked Freeman
out of a lineup. She was afraid that if she identified Hampton, his family would come
after her. Based upon her information, the police issued a warrant for Freeman, but he
was in jail at the time of Nance's shooting.

 Jermaine Session testified that he lived at the Sterling Forest Apartments. He
arrived home around 8 a.m., to find that his wife had let Hampton sleep there. Hampton
said he had shot Nance after Nance rushed up to him and they were arguing. Hampton
said they were arguing, not physically fighting, and he never mentioned that Nance had a
gun or knife. He also said he had done some acid. Hampton appeared scared and
distressed about the shooting, he was not laughing or bragging. In Session's police
statement, he described the conversation thusly: "And I heard that there had been a
shooting and I asked him if he knew anything about it and he said they was tripping on
acid and everything. He had got into a argument and that they was arguing and he shot
him." Session knew Nance, they were friends, they had even been roommates at one
time, but he had not seen him lately. Nance would go to La Promesa Apartments to buy
crack cocaine.

 Jason Yielding testified that he saw Hampton at the Sterling Forest Apartments the
night after the shooting. Around 9 or 10 p.m., Hampton asked for a ride; Yielding gave
him a ride, Hampton told him where to go, which was the corner of Redondo and Dunn. 
Hampton gave him five dollars for the ride. Hampton had a little bag with him in the car,
but Yielding never asked what was in it. Yielding said of Hampton's activity: "the back
window was cracked a little bit because he was--he was smoking a cigarette and it
sounded like I heard him throwing something. I looked back. I looked in my mirror on
the side and saw he was throwing something. And it looked like and it sounded, with the
wind blowing, it sounded like a sack."

 Several emergency responders testified about the scene following the shooting. 
Among others, John Lawson testified that he photographed and collected evidence from
the shooting, which included a plastic hair pick.

 Dean McCann, an officer in the Odessa Police Department homicide unit, testified
about the investigation. He explained how they came to issue a warrant for Anthony
Freeman, and how the warrant was withdrawn when they discovered Freeman had been in
jail at the relevant time. At the scene, they found a small silver cross, a blue hair pick, a
red baseball cap, and three shell casings. Police arrested Hampton on March 22. 
Hampton gave a statement while in custody. The taped statement was played for the jury,
but for the reasons explained above, we will not consider its contents in our analysis here. 
McCann testified that Nance had about $640 on his person when his body was
discovered. McCann did not believe the shooting was an accident or a self-defense
situation.

 The medical examiner, Rodney Tucay, testified about Nance's autopsy. He opined
that Nance died of a gunshot wound. Although Nance had both alcohol and cocaine in
his system, neither was of sufficient quantities to cause death. Neither did he think Nance
had internal organ damage that would indicate death by any other cause. Tucay found a
red mark on Nance's forehead which may have been an abrasion or blow from a blunt
object. It was an impact wound, rather than a sliding abrasion. It could have been caused
by falling down, or from an object striking him. Tucay could not determine the shooter's
distance from Nance, just that he was not in contact with the gun muzzle when shots were
fired.

 Aaron Fullerton, a firearms examiner with the Texas Department of Public Safety,
testified. He testified that the three casings found at the shooting scene came from the
same gun, that the bullet markings were consistent with a .25 caliber Lorcin pistol, that he
could not match the casings to the slide alone, that he would need the entire gun in order
to do that. He could not tell the distance from the shooter to the victim; he could not say
the gun slide was the same one that had killed Nance.

 Officer McCann was recalled for cross-examination. He testified at length about
the investigation. When he began the investigation on March 18, the name "Tweet" rang
a bell with him. He remembered Anthony Freeman as "Tweet," and put together a photo
lineup including Freeman's picture. Andrea Travioli positively identified Freeman as the
shooter a day or two later. He issued a warrant for Freeman based on this, but learned
several days later that Freeman had been incarcerated during the shooting. They found no
fingerprints on the gun, and no shoe prints in the area matched Hampton's shoes.

 Miguel Preston, also known as Monk, testified that he was at Tammy's apartment
on March 18, 1999. He saw nothing at that time. He and Hampton were in jail together
in August. At that time, Hampton told him "that dude was trying to take his sack of rocks
from him and he shot him." In other words, Nance was trying to take Hampton's bag of
cocaine. Preston testified he has been convicted of several felonies, has served time for
them, but was not offered a deal for his testimony. The prosecutor told him that Hampton
was trying to place blame for the murder on Preston and his brother. He had also heard
this from other sources.

 Heather Maye, a television reporter, testified that she found the third shell casing.

 Ronald Backer testified as custodian of records for Universal Toxicology
Laboratories. His lab had done the toxicology testing on Nance; he had both cocaine and
alcohol in his system when he died. He stated that many people lose their inhibitions and
critical judgment when drinking, and that the side effects of cocaine are different with
different people.

 Ed Hueske is a forensic training coordinator at North Texas Police Academy and a
consulting forensic scientist. He was asked by the defense to reconstruct the shooting. 
He testified that the placement of the shell casings and the ejection pattern of the gun
were consistent with the shooter running away from Nance; the bullet path through the
shooter's body was also consistent with Hampton running away; the physical evidence he
examined was consistent with the shooter running and firing.

 Celestine Brown testified that her son is a friend of Hampton's. She has seen both
Hampton and Nance, but does not really know either one. She testified that Nance has a
reputation for having a smart mouth, but not for being aggressive or violent. Nance had
come by her house around 4:30 a.m. the night of the shooting, banging on the door, and
looking for a $50 rock. She refused to open the door. About five minutes later she heard
gunshots. She found out someone had been shot the next morning. Nance commonly
came around the projects looking for crack.

 Joe Bob Pierce had been Nance's friend for sixteen years. He testified that
Celestine Brown is known as "Shortcake" and she sells crack. Pierce and Nance had
bought from her before. She is considered to be a last resort when looking for crack. 
Pierce was not surprised that Nance was looking for cocaine in the projects. Nance was
not aggressive when he was drinking.

 Tommie Woods had known Nance about nine years. She knew Nance went to
Shortcake for crack. Nance had a reputation for aggressively beating on doors in the
complex when he wanted crack. Nance was unwelcome in certain parts there. Nance
was violent and had beaten Woods' brother, causing $45,000 in medical expenses from a
cracked spleen and torn esophagus. Nance was drinking when he beat her brother.

 Raymond Freeman testified that he had sold crack to Nance in the projects. Nance
had a reputation for aggression and violence. Freeman had heard Nance threaten violence
in Hampton's presence, even threatening to use a gun if he needed drugs. Freeman is the
brother of Anthony Freeman, who had been initially accused of shooting Nance.

 James McCoy testified that he sold crack to Nance at La Promesa Apartments. In
the summer of 1998, Nance had pushed someone when he was high and looking for
drugs. Nance was not violent unless he was high.

Materiality of undisclosed evidence

 Here, the State's disclosure of Brady evidence occurred the day before it rested its
case in chief. Where the issue is late disclosure, defendant must show that if defendant
had known of the exculpatory evidence earlier, there was a reasonable probability of a
different outcome. Hampton, 86 S.W.3d at 612 n.26; Wilson v. State, 7 S.W.3d 136, 146
(Tex. Crim. App. 1999). With this in mind, we must conclude that Hampton has not met
his burden.

 We do not have the actual statement before us, but in requesting a continuance
defense counsel described it and explained why he needed it:

 Your honor, I have received a report from Detective--or Sergeant Carl
Rogers that was prepared for this case that we're here on and I did not have
this report until yesterday, on the fourth day of the trial. I received this--I've never seen it before until yesterday.


. . .

 

 I am making a motion for continuance based on the fact that there is
exculpatory information within this supplementary report, which would
indicate that witnesses--there are two witnesses, in particular, they were
staying, according to another witness, at 194 at the La Promesa Apartments.


 And these two girls are named Monica and Ashley and they have been, in
the report, stated as saying that there were two black males that ran from the
shooting and one of the girls says that she believes that one of the black
males was a guy by the name of Jarvis.


 And we, last night after I received the report, my investigator went out to
the La Promesa Apartments, knocked on Apartment No. 194, found out that
the girls that lived there before no longer live there, nobody knows where
they are. I don't have a last name. I don't know where to find them. 

 

 We first observe that the report apparently gives only a second-hand rendition of
what two witnesses, identified only by first names, told another witness who is not
identified (at least not in the record). Whether Hampton would have been able to find
these witnesses, whether their evidence would have actually reflected what the report
said, and whether it would have been deemed worth using at trial at all are all speculative. 
We recall that the evidence is uncontroverted that Jarvis Preston and Leon Hampton did
run to Preston's car shortly after the shooting, and that witnesses saw this does not
necessarily implicate either in the shooting itself.

 Next, we note that Jarvis Preston mentioned the rumor of two fleeing suspects in
his testimony in his statement to the police (presumably available to the defense counsel
before trial, as both defense and prosecution agree the State had an open file discovery
policy), and in his testimony during the State's case in chief. "I wanted to come down
here because, you know, what I am saying when I heard this about the two suspects
running down the alley." Preston was worried that someone might put him at the
shooting. Moreover, Anthony Tuda testified that he saw the shooting victim and two
other men. Although Tuda's statements were inconsistent on this point, he told police he
saw two black men at the shooting. Thus, although Hampton clearly did not receive
every source of this statement in a timely fashion, the gist of it was available through both
Preston's and Tuda's statements. Rogers' supplementary report although containing the
first names of two independent witnesses, apparently contains little more detail than the
statements of Preston and Tuda. Whether it would have been of any more assistance in
establishing an alternative defense is therefore speculative.

 Further, there was ample evidence that Hampton was the shooter. Witnesses
testified that Hampton was looking for a gun that night, had left Tamara McDonald's
apartment shortly before the shooting, came running back for his jacket shortly after the
gunshots, and two to three minutes thereafter appeared at Lashara Preston's porch. 
Lashara Preston testified she and her brother were watching television when they heard
shots. Andrea Travioli saw Jarvis and Hampton leave the apartments running shortly
after the shooting. Hampton told Preston he had shot at Nance very shortly after the
shooting. In addition to Jarvis Preston, Jermaine Session and Miguel Preston all testified
that Hampton told them he had shot Nance. John Cooper saw Hampton talking to Nance,
then saw him with arms extended like he was "popping off . . . shots." A plastic hair pick
like the one Hampton was wearing was found at the shooting scene. Hampton tossed
away a sack containing part of a gun, consistent with the one that shot Nance, the day
after the killing.

 Hampton's defensive theory was clearly that Nance was the aggressor and
Hampton shot in self-defense. Although he had at least some information regarding two
men fleeing the scene, had chose not to pursue this evidence. Hampton fully developed
his self-defense theory, and we cannot conclude that an earlier disclosure of the
supplementary police report would probably have changed the trial's outcome.

Conclusion

 We affirm the trial court's judgment.


 SUSAN LARSEN, Justice

May 22, 2003


Before Panel No. 4

Barajas, C.J., Larsen, and McClure, JJ.


(Publish)