**Opinion issued February 25, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00366-CR

————————————

**TRACE ROGERS SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 207th District Court**
**Comal County, Texas[1]**
**Trial Court Case No. CR2014-093**

---

## MEMORANDUM OPINION

---

[1]     The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas. Misc. Docket No. 15–9054 (Tex. Mar. 24, 2015); *see* TEX. GOV'T CODE ANN. § 73.001 (West 2013) (authorizing transfer of cases). We are unaware of any conflict between precedent of the Court of Appeals for the Third District and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

Trace Rogers Smith was convicted of attempted capital murder, aggravated kidnapping, tampering with physical evidence, and aggravated robbery in connection with an attack at a drug dealer's home. In a single issue, he contends that the State violated *Brady* disclosure requirements when it failed to inform him that one of the witnesses against him, Clint Barkley, had a prior murder conviction.

Because Smith does not allege that the State knew of the prior conviction and the only evidence on the issue indicates that the State was unaware of the conviction, we affirm.

## Background

Smith and those in his circle of acquaintances used and sold drugs. One night they congregated at a local drug dealer's house. One of the people there that evening was Debra Harris,[2] who had recently moved back to town. Smith went into the back bedroom with several women. He came out to the living room and told Harris that the women wanted her in the back room. Smith then sat "approximately ten feet from the door" of the bedroom.

Harris went into the back room and was confronted by three women. One was upset that Harris claimed to be romantically involved with her boyfriend. The other, who was Smith's girlfriend, was paranoid that Harris was a "snitch" and had "cloned" her phone to obtain information about drug transactions. The third had no

---

[2]      We will refer to the complainant as Debra Harris to protect her privacy.

independent issue with Harris but was friends with at least one of the other two women. During the confrontation, these women stabbed Harris eight times. They used a taser on her repeatedly. Harris was kicked in the head and torso. Additionally, the women told Harris to remove her clothes, and one of them reached inside of her "to check for a wire."

Smith entered the room at various times as this was occurring. At one point, Smith entered the room to give one of the women a cell phone, which was used to videotape the attack. At another point, Smith entered the room with a shotgun and yelled at Harris to "shut up" because she was screaming so loudly. Harris was already naked when he entered that second time. At some other point, Harris tried to escape, reached an arm out of the bedroom, and, in the process, knocked over and broke a glass vase in the hallway. Smith was at the door. He pushed Harris back inside and told the others to "wrap it up."

The confrontation ended with the women handcuffing Harris's wrists, placing shackles on her ankles, inserting a gag in her mouth made from a tennis ball, and blindfolding her. At that point, Smith's girlfriend came out and told him that Harris was "bleeding out." He understood that to mean that she might die from blood loss.

Smith entered the bedroom, used a dog chain to connect the handcuffs to the shackles, in effect "hog-tying" Harris, wrapped her in a sheet, and carried her to a

shed on the property. He placed her in the middle of the shed so she could not make any noises and locked the door. The undisputed evidence was that this occurred late at night with temperatures below freezing.

Smith and the other women left the property while Harris remained locked in the shed. Over time, Harris managed to work free of the handcuffs and remove all of the binding except the shackles on her ankles. She climbed out of a high window, drug herself along the ground to a nearby house, and hid in an unlocked car until morning, when she was discovered and taken to the hospital.

Smith, the three women, and the homeowner were arrested and charged with various crimes. They testified at each other's trials. The testimony from the co-defendants as well as from other fact witnesses detailed the relationships between these individuals, who were all associated through their drug use and sales.

Some witnesses admitted to having criminal histories and engaging in felonious behavior. For example, Smith testified that he had been convicted of two prior felonies and had been out of prison only two months when the attack on Harris occurred. He also admitted to selling drugs to children. Harris testified that the home owner had previously held a friend of hers in the same shed for days. The friend had been "put in the same shed . . . handcuffed and shackled, and kept in there as a slave. She was doped up and raped repeatedly by different men for two weeks."

Smith confirmed various aspects of his involvement. He admitted to being in the room and then calling Harris back there. He further admitted that he heard Harris yelling loudly, entered the room with a shotgun, saw Harris naked, and yelled for her to shut up. Finally, he admitted that he hog-tied her, wrapped her in a sheet, put her in the shed, and personally locked the door.

He testified that he "didn't expect them to kill her" but "that's what the women were trying to do." He agreed that he "carried a naked woman who had been stabbed, tased, bound, gagged, blindfolded, and left her in a shed" but insisted that he only "assisted in the last part of it." When attempting to reconcile this involvement with his earlier testimony that he opposes violence against women, he explained:

> I never once put my hands on that woman. I never once touched [Debra]. When I went in there to put the dog chain on the handcuffs, I never touched her. All I touched was the chain. When I picked her up and she was . . . in the sheet, that's all I touched was the sheet. . . . All I did was touch the sheet, pick the sheet up, and I placed her in the middle of the shed. I never once touched [Debra] at all with a knife, with my hands, not—nothing. I never once touched that woman in any violent way at all.

Finally, Smith admitted that, after he left the property, he burned Harris's belongings because he "didn't want to be caught with the stuff."

Another witness was Clint Barkley, who had driven Harris to the house where the attack occurred. He told the jury that he was living in the Comal County jail and had been "sentenced to prison." He testified that he heard noises coming

from the back room where Harris had gone, including a lot of banging sounds similar to a wrestling match. He heard a taser going off repeatedly and thought he heard Harris yell for him. He saw Smith "guarding the door" and going in and out of the bedroom. He later saw Smith and the homeowner standing outside of the shed but could not see what they were doing. He admitted that, even with all of this knowledge, he left the property without Harris.

What Barkley did not disclose was that, in addition to whatever crimes he committed that led to his admitted prison sentence, he also had been convicted of murder in 2000 in Florida. Barkley volunteered that information while testifying at the subsequent trial of one of Smith's co-defendants. Following his testimony, the State notified Smith—who had already been convicted—of Barkley's testimony and informed him that the State had been unaware of the conviction when Barkley testified at Smith's trial. That undisclosed criminal history is the basis of this appeal.

According to Smith, Barkley's testimony as a non-accomplice witness was necessary for his attempted-murder conviction and, had Smith known of the prior murder conviction, Barkley would have been subject to impeachment. According to Smith, by discrediting the non-accomplice witness, the trial likely would have ended differently.

### *Brady* Requires Disclosure of Known Information that is Favorable to the Defendant and Material

The Supreme Court in *Brady v. Maryland* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963). "The purpose of this rule [is] to avoid an unfair trial of the accused . . . ." *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011). To find reversible error under *Brady*, a defendant must show that

(1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith;

(2) the withheld evidence is favorable to him;

(3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.

*Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). The defendant challenging the nondisclosure has the burden to establish the *Brady* violation. *Id.*

*Brady* applies to situations in which the defendant discovers post-trial that there was "information which had been known to the prosecution but unknown to the defense." *Pena*, 353 S.W.3d at 810 (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976)). While *Brady* requires the State to disclose known information that is favorable and material, "*Brady* and its progeny do not

7

require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist." *Pena*, 353 S.W.3d at 810 (quoting *Hafdahl v. State*, 805 S.W.2d 396, 399 n.3 (Tex. Crim. App. 1990) (en banc)).

In a recent case concerning undisclosed criminal histories of witnesses, a court of appeals held that "access to information" is not the same thing as "possession of the information"; therefore, undisclosed criminal histories of which the State has no knowledge do not violate *Brady*. *See In re State ex rel. Munk*, 448 S.W.3d 687, 693 (Tex. App.—Eastland 2014, no pet.); *see also Gomez v. State*, No. 14-97-00188-CR, 1999 WL 497572, at *2 (Tex. App.—Houston [14th Dist.] July 15, 1999, pet. ref'd) (mem. op., not designated for publication) (holding that when prosecutor did not discover that murder victim had criminal record because it was listed under variant of victim's name, there was no *Brady* violation).

### The Nondisclosure Did Not Violate *Brady*

The focus of Smith's appeal is on whether Barkley's prior murder conviction was "favorable" and "material." Smith does not offer any argument concerning whether the State knew of the conviction.

The State has affirmatively stated that it did not know of Barkley's conviction when Barkley testified at Smith's trial. Smith does not present any evidence that would contradict this assertion. Nor does he dispute it. Further, Smith

makes no argument that the State had a duty to discover out-of-state criminal records.

Without any suggestion that the State knew of the prior conviction before Barkley testified against Smith or had a duty to discover it, we conclude that Smith has failed to establish a *Brady* violation. *See Pena*, 353 S.W.3d at 811; *Hafdahl*, 805 S.W.2d at 399 n.3; *Munk*, 448 S.W.3d at 693; *see also Gomez*, 1999 WL 497572, at *2.

We overrule Smith's sole issue.

## Conclusion

We affirm the trial court's judgment.


Harvey Brown
Justice

Panel consists of Justices Radack, Massengale, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).