Andre HAYGOOD, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–02–00685–CR.

Court of Appeals of Texas,
San Antonio.

Nov. 12, 2003.

Rehearing Overruled Jan. 5, 2004.

Suzanne M. Kramer, San Antonio, for appellant.

Daniel Thornberry, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

Opinion by SANDEE BRYAN MARION, Justice.

A jury found defendant, Andre Haygood, guilty of murder and assessed punishment at life imprisonment and a $10,000 fine. In five issues on appeal, defendant challenges the sufficiency of the evidence and various rulings by the trial court. Because the evidence is sufficient to support the verdict and we find no abuse of discretion, we affirm.

## SUFFICIENCY OF THE EVIDENCE

■ In his third issue, defendant asserts the evidence is factually insufficient to support his conviction. We review the factual sufficiency of the evidence under the appropriate standard of review. *See Johnson v. State,* 23 S.W.3d 1, 6–7, 10–11 (Tex.Crim.App.2000); *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996). The standard of review is the same in both direct and circumstantial evidence cases. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex. Crim.App.1999).

In the early morning hours of May 4, 1998, John Brown and Michael Alvarado were driving around in a brown Camry. At some point, Brown decided he wanted to speak to three young women, Monica Clemons, Michelle Farley, and Tishonda Farley, who were driving around in their car. The three women parked their car in an abandoned parking lot near an H.E.B. grocery store, and Brown drove up next to their car, where they talked briefly. While in the abandoned parking lot, a small white car that Brown and Alvarado had seen earlier that evening, drove into the H.E.B. lot. Eventually, Brown, Alvarado, and the three women also drove to the H.E.B. parking lot. Brown stopped his car about twelve to fifteen feet away from the white car. Two men, who were standing next to the white car, asked Brown, who was seated in the Camry's driver's seat, if he wanted to buy some drugs. Alvarado said Brown tried to "blow off" the two men. Alvarado hit Brown on the leg and said "let's go." Alvarado then saw one of the men pull out a gun and shoot Brown from a distance of about twelve to fifteen feet. Everyone in the white car fled the scene. Alvarado moved Brown from the driver's seat to the passenger seat, got into the driver's seat himself, and drove until he found a police officer at approximately 2:30 a.m. Brown was dead in the passenger seat.

Alvarado and the three women described the shooter as about 5'7" to 5'9" in height. Alvarado said the shooter had a goatee or string beard. Although the three women were driving away from the scene when the shooting occurred, they described the shooter as having dark skin, about nineteen or twenty years of age, with a short haircut, and wearing blue jeans and a white sleeveless t-shirt. Michelle said Alvarado never got out of the Camry before the shooting. Monica said Brown and Alvarado were still seated in the Camry when she heard a gunshot. Alvarado later identified defendant in a photo array as the person who shot Brown. Although the three women could not identify defendant in the photo array as the shooter, Monica chose several pictures from the array, one of which was the defendant's. Monica thought defendant was in the white car but not the shooter.

Brown's autopsy revealed he was killed by a single gunshot that entered the top, left portion of his back, traveling through his lungs and heart and lodging in his right chest wall. Alvarado tested positive for gun shot residue ("GSR") on his right hand, but there was no evidence that the shot that killed Brown was fired within two or three feet of Brown.

At trial, defendant offered alibi evidence that he arrived in town at around midnight on May 3, 1998 and drove to his father's house at approximately 2:00 a.m., where he borrowed his father's truck and left to visit the mother of his children. Defendant's step-sister said he returned to his father's house at about 1:45 or 2:00 a.m. and spent the night.

After a review of all the evidence, we hold it is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we overrule defendant's third issue.

### *BRADY* DISCLOSURE

 In his first issue, defendant asserts the State failed to timely disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At trial, James Garcia, a forensic scientist in the Bexar County Crime Lab's trace evidence sec-

tion, testified there were GSR particles on Alvarado's right hand, which indicated he had either fired a weapon or been in close proximity to a discharged firearm. It was not until during trial that defense counsel learned Garcia said these conclusions were modified in 1999 to add a third alternative: that Alvarado had handled a discharged firearm. Defendant contends reversible harm resulted from this late disclosure because he was unable to make effective use of the 1999 conclusions.

■■■ Impeachment evidence is considered exculpatory evidence. *Ex parte Richardson,* 70 S.W.3d 865, 872 (Tex.Crim. App.2002). Suppression of exculpatory or even favorable evidence to a defendant violates due process when the evidence is material to either guilt or punishment. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. The existence of good faith or bad faith on the State's part is not relevant. *Id.* To demonstrate a violation of due process rights, the defendant must show that: (1) the State failed to disclose evidence, (2) the evidence was favorable to the defendant, and (3) the fact that the evidence was not disclosed creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Ex parte Richardson,* 70 S.W.3d 865, 870 (Tex.Crim. App.2002).

■■■ However, even in the face of deliberate concealment by the State or its agents, there is no due process violation unless the concealed evidence is material, and when examined as part of the entire record, creates a reasonable doubt con-

cerning the defendant's guilt that would not otherwise exist. *Hampton v. State,* 86 S.W.3d 603, 612 (Tex.Crim.App.2002).[1] The mere possibility that undisclosed evidence may have helped the defense or affected the trial's outcome does not establish "materiality" in the constitutional sense. *Id.* Whether the evidence is material is viewed in the context of the overall strength of the State's case. *Id.* at 613.

Here, the parties dispute whether the third alternative offered in 1999 was material; that is, whether there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. According to defendant, the 1999 conclusions would have impeached Alvarado's testimony, thus undermining the State's case.

During the State's case-in-chief, Garcia testified that based on the GSR particles found on Alvarado's right hand, in 1998 "we were concluding [in] our reports the subject probably had 'either fired a weapon or been in close proximity to a discharged firearm.'" Garcia said in 1999 "[w]e ... modified the conclusion to read the subject discharged the firearm, handled the discharged firearm, or was in close proximity to a discharged firearm." Garcia said the report was modified because "we felt that we should give the majority of the potential reasons for the source of these particles, it would only be brought out in testimony, of course, we would share that information, but we also felt the investigators or anybody who would be in need of such analysis should also know the other sources to where that

---

1. In comparing reversible error under *Brady* and Texas Rule of Appellate Procedure 44.2(a), the *Hampton* Court noted that, "[a]lthough reversible error under *Brady* will always constitute reversible error under Rule 44.2(a), the converse is not true." *Hampton v. State,* 86 S.W.3d 603, 612 (Tex.Crim.App. 2002). The Court held, "The three-pronged test for reversible error for a *Brady* violation is entirely different from the constitutional harmless error standard set out in Tex.R. App. P. 44.2(a)." *Id.*

residue may arise from." Other than these three alternatives, Garcia said a secondary or tertiary transfer also could occur when an individual touches something on which residue has landed.

Following the above testimony, the trial court took a twenty minute recess, outside the jury's presence, during which defense counsel stated he had received a copy of the 1998 GSR analysis, but not a copy of any modified GSR analysis. When asked if a report actually issued following the 1999 modifications, Garcia replied that only the 1998 report issued and a second report containing modified findings was not issued. Garcia explained the modification to his report resulted from a policy change within his office and not from a second GSR analysis. Garcia said only one analysis was performed on the GSR particles found on Alvarado's hand. Defense counsel asked for additional time to review documents that would verify this policy change for the purpose of challenging Garcia's credibility. The court instructed the State to get the documents, but stated trial would resume at the end of the twenty-minute recess. However, Garcia was recalled the next day because he was unable to obtain the documents from his office and return to the courthouse on the same day. No further discussion regarding the modification was held.

During the defendant's case-in-chief, Richard Ernest, a forensic ballistics expert, testified that GSR particles on an individual's hands would indicate the person has fired a weapon, handled a weapon that has been discharged, or was in the "firing cloud" of a discharging weapon. Ernest agreed with Garcia's conclusion that Alvarado's right hand tested positive for GSR, which indicated Alvarado had fired a gun, touched a gun, or been in close proximity to a firing gun. Ernest's written report stated these same three results.

After an examination of the entire record, we conclude the third alternative was not "material." Defendant has not established that his knowledge of the change in policy at the Bexar County Crime Lab would have undermined the confidence in the verdict. Defendant does not explain on appeal what "effective use" he would have made had he known of the policy change in view of the fact that his own expert arrived at the same three conclusions and testified to such at trial. For these reasons, we overrule defendant's first issue.

## REMOVAL OF DEFENDANT FROM COURTROOM

▮▮▮ In his fourth issue, defendant asserts the trial court abused its discretion when it removed him from the courtroom. A defendant's absence from trial will not result in reversal unless there is a showing of actual injury or a showing of facts from which injury might reasonably be inferred. *Mares v. State*, 571 S.W.2d 303, 307 (Tex. Crim.App.1978); *see also Carrion v. State*, 926 S.W.2d 625, 629 (Tex.App.-Eastland 1996, pet. ref'd). Also, a defendant's absence when only issues of law are considered, will not result in reversal unless his presence bears a "reasonably substantial relationship to the opportunity to defend." *Mares*, 571 S.W.2d at 307; *Guerra v. State*, 760 S.W.2d 681, 696 (Tex.App.-Corpus Christi 1988, pet. ref'd).

After the defense rested, the State asked to call San Antonio police officer Larry Ripley to rebut the testimony of defense witnesses who said defendant was at home the night of the murder. Defense counsel objected and the court held a hearing outside the jury's presence to consider

the defendant's earlier motion to suppress any statements he made. Outside the jury's presence, Ripley testified he met with defendant, about one month after the shooting, while defendant was a patient at the Brooks Army Medical Center ("BAMC") undergoing treatment for a gunshot wound to the abdomen. Ripley said defendant was not in custody or a suspect in any criminal investigation at the time. He said defendant was lucid and coherent when they spoke. During the conversation, defendant denied knowledge of the shooting, saying he was at his father's house at the time. When defendant asked for a lawyer, Ripley discontinued the conversation.

After Ripley was excused, defense counsel said he was in a position to obtain BAMC hospital records and hospital witnesses to prove defendant's statement was not voluntarily given because defendant was on medication while at BAMC. After further discussion, the court ruled the statement was voluntary, but allowed defense counsel to bring copies of the medical records from his office to the courthouse. The court said it would "find somebody" to explain the effect of the drugs defendant was taking while in the hospital. At 1:25 p.m. the hearing reconvened on the record, in the presence of the State, defense counsel, and defendant. Defense counsel asked that a bill of exception be made about previous discussions held off the record about the medical records.

On the bill of exception, defense counsel testified that when he returned to the courthouse with the medical records, the court reporter was not present. He said the judge began to review the records and consulted unknown "medical people" over the telephone about the records.[2] He said he eventually asked that any further proceeding be on the record, at which point defendant raised his hand and started to object that he too wanted the proceeding on the record. Defense counsel stated that the judge wanted "an informal discussion" and ordered defendant removed from the courtroom. Before defendant was removed, defense counsel objected to the removal. According to defense counsel, the judge said "this was an informal discussion, didn't need to be on the record and that we should have this discussion." Counsel said defendant expressed concern about being removed from the courtroom and was "very upset." Counsel concluded the bill of exception by stating the trial court then ordered both defendant and defense counsel removed from the courtroom and taken to a holding cell.

Following this testimony on the bill of exception, the trial court said counsel's recollection of what transpired was not entirely consistent with its recollection. The court stated, "At no time during the discussion off the record was any substantive right of the defendant discussed other than whether or not we need to have the record proved up through getting a custodian of medical records and also getting a medical person to testify."

On appeal, defendant does not explain how he was harmed by his absence from the courtroom. Instead, defendant merely recites he was fundamentally harmed because his absence was in violation of Texas

2. Although on appeal defendant does not complain about this telephone conversation, we do not condone the trial court's off-the-record telephone conversation with "medical people." *See Erskine v. Baker*, 22 S.W.3d 537, 539–40 (Tex.App.-El Paso 2000, pet. denied) (considering *ex parte* communications to be error).

Code of Criminal Procedure article 33.03, which provides that "the defendant must be personally present at the trial" of any felony. *See* Tex.Code Crim. P. art. 33.03 (Vernon 1989). However, because defendant has not shown that his absence from the courtroom harmed his defense when only a legal issue, *i.e.,* the admissibility of certain evidence, was under consideration; we overrule his fourth issue.

## EXCLUSION OF EVIDENCE

■ In his second issue, defendant asserts the trial court erred in excluding evidence that was relevant to whether his statement to Ripley was voluntary and that would have enabled him to more effectively cross-examine Ripley.

■ We review the admission or exclusion of evidence for an abuse of discretion. *Goff v. State,* 931 S.W.2d 537, 553 (Tex.Crim.App.1996). To preserve a complaint that the trial court erroneously excluded evidence, the complaining party must bring forward a record indicating the nature of the evidence. *See* Tex.R.App. P. 33.1, 33.2; Tex.R. Evid. 103(a)(2). If the excluded evidence is not apparent from the context of the record, it must be brought forward either through a timely offer of proof or a formal bill of exception. *Id.; Guidry v. State,* 9 S.W.3d 133, 153 (Tex. Crim.App.1999), *cert. denied,* 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000); *Jenkins v. State,* 948 S.W.2d 769, 775 (Tex. App.-San Antonio 1997, pet. ref'd). Absent a showing of what such testimony would have been, or an offer of a statement concerning what the excluded evidence would show, nothing is presented for review. *Guidry,* 9 S.W.3d at 153.

Defense counsel said he wanted a recess "to get the medical records and get some-

one from BAMC . . . to come and testify to [defendant's] condition, because that would reflect directly on the condition of the defendant at the time he made the statements . . . so we wanted to bring in evidence for the defense to show that his medical condition was such that he was under medication, probably not thinking clearly." Defendant made no offer of proof regarding what the medical personnel would have said about the medication defendant was taking, the effect of the medication on defendant, his condition at the time he spoke with Ripley, and what, if anything, hospital personnel said to Ripley while Ripley was with defendant. As such, defendant has failed to present anything for our review on appeal; therefore, we overrule defendant's second issue.

## NEW TRIAL HEARING

■ At the hearing on defendant's motion for new trial, defendant called to the stand Sean Jones for the purpose of having Jones testify that he had told Lucas Huckelberry that defendant did not shoot Brown. At the time of the alleged conversation between Jones and Huckelberry, they were both inmates at the Bexar County Jail. Before Jones took the stand, his appointed attorney informed the court Jones intended to invoke his Fifth Amendment right to remain silent. Indeed, rather than answer any question put to him by defense counsel, Jones responded, "I take the 5th." Defense counsel then called Huckelberry to the stand. Huckelberry testified he and Jones were watching a television news report about defendant's trial. When counsel asked Huckelberry what Jones said, the State objected on hearsay grounds. Defense counsel countered that because Jones made himself unavailable by asserting his right to remain silent, his statement to Huckelberry

was admissible under Texas Rule of Evidence 803(24) as a statement against penal interest. The court, after hearing Huckelberry's testimony on voir dire and arguments of counsel, concluded the statement was not against Jones's penal interest; therefore, Huckelberry could not testify to what Jones told him.

On appeal, defendant contends the trial court erred by allowing Jones to assert a Fifth Amendment right and in ruling that Jones's statement was inadmissible hearsay. Defendant contends that Jones's statement was against his penal interest because it would have implicated him in a planned car-jacking. Defendant argues it was inconsistent of the trial court to allow Jones to assert a Fifth Amendment privilege on the one hand but then rule his statement was not against his penal interest. While defendant's argument has merit, we conclude the trial court did not abuse its discretion in denying defendant's motion for a new trial based on newly discovered evidence.

A motion for new trial may be filed upon the discovery of new and material evidence. TEX.CODE CRIM. PROC. ANN. art. 40.001 (Vernon Supp.2003). The decision to grant or deny a motion for new trial is left to the sound discretion of the trial court and in the absence of an abuse of discretion an appellate court should not reverse. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex.Crim.App.2002); *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App.1995); *Eddlemon v. State*, 591 S.W.2d 847, 849 (Tex.Crim. App.1979). Additionally, motions for new trial based on newly discovered evidence are not favored by the courts and are viewed with great caution. *Drew v. State*, 743 S.W.2d 207, 225 (Tex.Crim.App.1987).

A trial court does not abuse its discretion in denying a new trial unless the record shows (1) the newly discovered evidence was unknown or unavailable to the movant at time of trial; (2) the movant's failure to discover or obtain the evidence was not due to lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex.Crim.App.2003); *Eddlemon*, 591 S.W.2d at 849. Failure to establish any of the essential requirements warrants a refusal to grant a new trial. *Markham v. State*, 644 S.W.2d 53, 55 (Tex.App.-San Antonio 1982, no pet.). Here, the State does not dispute whether defendant met the first three prongs of this test. Instead, the State argues the newly discovered evidence would not have led to a different result at trial.

The Court of Criminal Appeals has explained the fourth prong as follows:

[S]hould it appear to the trial court that under the circumstances of the particular case the credibility or weight of the new evidence is not such as would probably bring about a different result upon a new trial, it is within its discretion to deny the motion. Thus it has been said that the new evidence must be "probably true." And although exceptions may be found, as a rule new evidence which is merely cumulative, corroborative, collateral or impeaching will rarely be judged by trial or appellate courts to be of such weight as likely to bring about a different result.

*Jones v. State*, 711 S.W.2d 35, 37 (Tex. Crim.App.1986). In other words, the trial court can find the new evidence is probably not true when it contradicts either the mass of reliable testimony at trial or the

defendant's own testimony, or the new testimony is inconsistent or otherwise inherently suspect. *Henderson v. State,* 82 S.W.3d 750, 755 (Tex.App.-Corpus Christi 2002, pet. ref'd). When the truth of newly discovered evidence is contested, the credibility of witnesses and the probable truth of the new evidence are matters to be determined by the trial court. *Keeter,* 74 S.W.3d at 37.

Before ruling that Huckelberry's testimony was inadmissible hearsay, the trial court allowed defense counsel to question him about his conversation with Jones. On voir dire, Huckelberry said Jones told him that Jones, Jones's girlfriend, and another male friend drove up next to the Camry in the H.E.B. parking lot, and Jones's friend "hopped out of the car with the pistol and blasted ... Brown, one time in the head." Huckelberry said Jones told him he saw "an Asian guy jump out of [Brown's] car and run behind the H.E.B. He knew the Asian guy to be named Pompay." Huckelberry said Jones did not identify his friend by name. The trial court also considered Huckelberry's affidavit and a letter Huckelberry sent to defendant, both of which were consistent with his testimony at the hearing. At the conclusion of the hearing, the court found Huckelberry to be credible in his testimony that he heard Jones say something with respect to defendant's case. However, the court expressed doubt over the credibility of Jones's alleged statements regarding who shot Brown.[3]

A trial court acts within its discretion so long as the record provides some basis for disbelieving the testimony. *Keeter,* 74 S.W.3d at 38. The vague reference to Jones's friend as the shooter is contradict-

ed by Alvarado identifying defendant as the assailant. Allegedly, Jones saw an Asian male exit Brown's car after the shooting. Alvarado and the three young women testified that only Brown and Alvarado were in Brown's car. The forensic evidence established Brown was shot in the back, not the head, and from a distance of at least twelve feet and not at close range. Based upon the authority of the trial court to judge the credibility of the witnesses and the weight to be given their testimony, we conclude the court may have properly found the new evidence defendant presented as a basis for his motion for new trial was probably not true. Accordingly, we hold the trial court did not abuse its discretion by denying defendant's motion for new trial, and we overrule defendant's fifth issue on appeal.

## CONCLUSION

We overrule defendant's issues on appeal and affirm the trial court's judgment.

---

3. The court stated, "I have a problem with the language in the letter and the language in the affidavit, as to not believe that there is a bolstering effect here."