



## MEMORANDUM OPINION

No. 04-08-00934-CR

Terry **ADAMS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2007CR9864
Honorable Raymond Angelini, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
    Phylis J. Speedlin, Justice
    Steven C. Hilbig, Justice

Delivered and Filed: October 7, 2009

AFFIRMED

Terry Adams was convicted by a jury of manslaughter and sentenced to twenty years imprisonment. On appeal, Adams asserts the trial court abused its discretion in denying his motion for a new trial on punishment despite a clear *Brady*[1] error. We affirm the trial court's judgment.

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

## BACKGROUND

Although Adams was indicted for the offense of murder, a jury found him guilty of the lesser included offense of manslaughter. The State called four witnesses to testify during the punishment phase of the trial, and defense counsel called one witness. After Adams was sentenced to twenty years imprisonment, he filed a motion for new trial claiming the State failed to disclose that one of the witnesses who testified for the State during the punishment phase had a prior felony conviction. Adams asserted that this failure to disclose the prior conviction violated his due process rights under *Brady*. After a hearing, the trial court denied the motion for new trial.

## STANDARD OF REVIEW

A trial court's ruling on a motion for new trial is reviewed under an abuse of discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id*. A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id*.

## DISCUSSION

Adams contends the State failed to timely disclose exculpatory evidence in violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Adams asserts the State failed to disclose that one of the witnesses called during the punishment phase of trial had a prior felony conviction that could have been used for impeachment purposes. Impeachment evidence is considered exculpatory evidence. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006); *Haygood v. State*, 127 S.W.3d 805, 809 (Tex. App.—San Antonio 2003, pet. ref'd).

To find reversible error under *Brady*, Adams was required to show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed the outcome of the trial would have been different. *Webb*, 232 S.W.3d at 114; *Lempar v. State*, 191 S.W.3d 230, 240 (Tex. App.—San Antonio 2005, pet. ref'd). Incorporated into the third prong, materiality, is a requirement that Adams must be prejudiced by the State's failure to disclose the favorable evidence. *Harm*, 183 S.W.3d at 406.

The State initially challenges whether Adams established the failure to disclose evidence. At the motion for new trial hearing, the prosecutor initially testified that when defense counsel inquired about the prior conviction after trial, the prosecutor told him that she believed that they had talked about the prior conviction before trial. The prosecutor further stated that the other prosecutor who assisted with the case also thought defense counsel knew about the prior conviction. In response to the trial judge's question regarding whether the information was disclosed to defense counsel, the prosecutor responded, "I can't say yes or no. ... I'm saying that I don't recall." The trial judge then asked the prosecutor whether she did or did not turn over the information regarding the prior conviction to defense counsel. The prosecutor stated, "I, apparently, did not according to the Defense. And I don't have an independent recollection that I didn't." The trial judge then asked the prosecutor whether she had the record of the prior conviction that would have been turned over. The prosecutor responded that she would have allowed defense counsel to look at the NCIC, TCIC, an on-line database.

Viewing the evidence in the light most favorable to the trial court's ruling, the trial court could have believed from the prosecutor's early testimony that defense counsel was informed of the

prior conviction in conversations that occurred before trial. Even if we assume, however, that the trial court found that the information had not been disclosed, Adams had the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of his trial would have been different had the prosecutor made a timely disclosure. *Webb*, 232 S.W.3d at 115. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Harm*, 183 S.W.3d at 409. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. *Webb*, 232 S.W.3d at 115. A determination concerning the materiality prong of *Brady* involves balancing the strength of the exculpatory evidence against the evidence supporting the conviction or, in this case, punishment. *Hampton v. State*, 86 S.W.3d 603, 613 (Tex. Crim. App. 2002). To rise to the level of reversible error, Adams was required to show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Hall v. State*, 283 S.W.3d 137, 171 (Tex. App.—Austin 2009, no pet.).

As previously noted, Adams was indicted for the offense of murder. During the guilt/innocence phase of trial, evidence was presented that Adams, Ruben Ramos, Aaron Saied, and Ryan Phelps were at Adams's apartment watching television and playing video games. Both Ramos and Saied saw Adams pointing a gun at Phelps in the hallway. Phelps told Adams to quit playing around. Both Ramos and Saied heard the gun click, but the gun did not discharge. Both Ramos and Saied then heard Adams pump the shotgun or rifle which would load a round into the chamber. Phelps again told Adams to quit playing around. Adams then shot Phelps.

Adams looked nervous and panicky like he had not expected the shotgun to fire. Adams kicked Phelps's foot and told him to get up. Adams then started panicking and crying and telling

Saied and Ramos to help him. Adams asked Ramos to get a truck to get rid of the body. Adams came up with a story to tell the police and pointed the gun at Saied and told him he knew what would happen if he did not stick with the story. The story was that Phelps went to use the restroom while everyone was outside, and they heard a gunshot and went inside where Phelps was laying on the floor as if he tripped over the gun. After Adams wiped the shotgun with baby wipes, Saied, Ramos, and Adams went to Saied's apartment where Adams washed his hands with bleach. Adams also changed his clothes.

Rodrigo Yeverino received a phone call from Saied around 5:00 a.m. When Yeverino arrived at Saied's apartment, Adams handed him a green pouch which Yeverino put in the back seat of his truck. When the police arrived, Yeverino told them about the pouch. The police retrieved the pouch which contained shotgun shells.

Officer Bernard Costa, Jr. arrived at the scene and observed Phelps's body in a large pool of dry blood. Officer Costa interviewed Adams; however, Officer Costa did not believe Adams's version of the events. Officer Costa arrested Adams for murder and transported him to police headquarters.

When the police arrived at the scene, Saied told them the story Adams had made up. Saied was then placed in the back of a police car, and when an officer got into the front of the car, Saied told the officer the truth because he then felt safe. Saied testified that he saw Adams with the shotgun on many occasions and Adams told him he took it to the shooting range.

Kristen Scalzo was Adams's girlfriend. Scalzo owned a shotgun that she kept at the apartment where she lived with Adams and their daughter. Scalzo testified that she and Adams fired the shotgun at the shooting range two or three times. Scalzo testified that Adams did not have any

experience with shotguns other than when he was with her at the shooting range. Scalzo testified that Adams did not know how to use the shotgun and that she and the people at the shooting range were teaching him. Scalzo testified that she was nervous when Adams played with the shotgun because he was inexperienced. Scalzo testified that Adams often did things that were reckless. Scalzo testified that Adams and Phelps were very good friends.

Detective Guillermo Mendoza interviewed Adams, and Adams's videotaped statement was played for the jury. Adams admitted to shooting Phelps but claimed it was an accident. Adams had invited Phelps to move in with Adams and Scalzo, and they had been good friends for about a month. Adams testified that both men were playing with the gun. Adams admitted that he loaded the gun but thought he used an empty casing. Adams admitted that he lied to the police officer at the scene about what had occurred and further admitted that he made up the story about being outside when Phelps tripped. Adams did not remember telling Ramos to help him get rid of the body. Adams also did not remember Phelps or anyone telling him to put the gun down.

After the jury found Adams guilty of manslaughter, the punishment phase of the trial began. The State first introduced into evidence a stipulation of Adams's prior offenses which included: (1) a 1995 conviction for grand theft; (2) a 1996 conviction for grand theft; (3) a 1997 conviction for battery; (4) a 1997 conviction for grand theft; (5) a 1998 conviction for driving while license suspended and eluding an officer; (6) a 2000 conviction for unauthorized use of a motor vehicle; and (7) a 2004 conviction for terroristic threat which involved Adams threatening to kill Scalzo, his girlfriend. Although Adams was originally placed on deferred adjudication community supervision for the terroristic threat offense, he subsequently served time in jail when he violated the terms of his community supervision.

The first witness, who was called out of order, was Adams's mother, Dana Ohrmund. Ohrmund testified that Adams's father died when Adams was eleven. Because Ohrmund had to work, Adams was left without supervision. Ohrmund testified that Adams was always reckless. Ohrmund also testified that Adams often invited homeless people into their home to feed them.

Judith Nichols was a close friend of Phelps. In September of 2006, Adams threatened to run over Nichols, who was pregnant, if she was walking to the store alone. Nichols stated that she did not file a police report because she had her family to protect her. On another occasion, Adams threatened to shoot her because she told him to be quiet and go away. Nichols stated that she "just blew it off." Nichols testified that Phelps was like a little brother to her and would help her take care of her son.

Arlene Richmond testified that Adams threatened two or three times to shoot her with a sawed-off shotgun. Richmond stated that she called the police, but the officer told her there was nothing they could do because it was just "word of mouth." When Richmond told Adams that some of the other apartment residents were complaining about him teaching his three-year-old daughter to call people "nigger" and "wetback," Adams told her that he would shoot whoever did not like it. Adams also told his daughter, who was almost three, to call Richmond a "white stupid big ass." Richmond admitted that she did not like Adams.

Phelps's father testified that Phelps was very loving. Phelps had 12 siblings and was especially close to his autistic brother who was a year older than him.

Saied testified that between June 1, 2007 and August 12, 2007, he often saw Adams with the shotgun used to shoot Phelps. When there was fighting at the apartment complex, Adams would carry the shotgun onto the balcony of his apartment and cock the gun. The people in the apartment

complex would then scatter. Saied testified this happened more than ten times. Saied also saw Adams point the shotgun at two other children and pretend that he was going to shoot them, and he saw Adams point the gun at his girlfriend. Saied further testified that Adams had pointed the gun at him a few times.

At most, Nichols's prior conviction would have impeached her credibility with regard to the two threats she said Adams made toward her. However, defense counsel had already impeached Nichols's credibility because she admitted that she did not report the threats to the police. Moreover, the jury heard evidence that Adams had seven prior convictions, including a conviction for battery and for terroristic threat. The jury further heard how Adams threatened Richmond and taught his three-year-old daughter to disrespect people of other races. Finally, the jury heard how Adams had pointed the gun at other people on numerous occasions. Therefore, Adams failed to show that the evidence of Nichols's prior conviction would put the whole case in such a different light as to undermine our confidence in the jury's verdict as to punishment. *See Hall*, 283 S.W.3d at 171. Because Adams failed to establish that it is reasonably probable that the outcome of his trial would have been different if the prosecutor made a timely disclosure of Nichols's prior conviction, the failure, if any, by the State to disclose the prior conviction was not reversible error under *Brady*. *See Webb*, 232 S.W.3d at 115; *Lempar*, 191 S.W.3d at 240.

Catherine Stone, Chief Justice

DO NOT PUBLISH