

## NUMBER 13-08-00402-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**EVELYN LOUISE GRIFFIN,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

### On appeal from the 94th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Yañez and Vela
### Memorandum Opinion by Chief Justice Valdez

A jury convicted appellant, Evelyn Louise Griffin, of the offense of assault on a

public servant. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1) (Vernon Supp. 2009). The

trial court sentenced Griffin to two years' imprisonment.[1] In four issues, Griffin contends

that: (1) the evidence was legally and factually insufficient to support her conviction; (2)

---

[1] Although assault on a public servant is a third-degree felony, *see* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1) (Vernon Supp. 2009), Griffin's punishment range was enhanced to a second-degree felony after the court received evidence of a prior federal felony conviction for possession and conspiracy to distribute crack cocaine. *See id.* § 12.42(a)(3) (Vernon Supp. 2009).

the State withheld *Brady* evidence, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963); and (3) the assault charge infringed upon her constitutional right to discipline her child. We affirm as modified.

## I. BACKGROUND

Around 2:00 p.m. on May 10, 2006, Griffin arrived at Carroll High School in Corpus Christi in search of her daughter, De'Ja Griffin. Although the events that transpired were hotly disputed, it is undisputed that at some point, Griffin found De'Ja and began to "discipline" her. Campus police separated them; however, an altercation later broke out between Griffin and a campus police officer.

**A.     The State's Evidence**

*1. Officer Jimmy Rivera's Testimony*

Officer Rivera, a Corpus Christi Independent School District Police Department officer assigned to Carroll High School, testified that on May 10, 2006, between 2:15 and 2:30 p.m., he received a call on his radio that a parent was "chasing a child" and that the parent and child were in a dressing room located near the gym. Officer Rivera, accompanied by Roy Barrera, Carroll High School assistant principal, proceeded to the gym. When Officer Rivera arrived at the dressing room, he saw Griffin with "a board in her hand" and "yelling" at De'Ja. Officer Rivera testified that he took the board from Griffin and that Griffin "began to slap, punch, and hit her daughter and grabbed her by the hair and . . . yank[ed] her hair and punch[ed] her on the face and the head." Officer Rivera testified that he and Barrera were "finally" able to get Griffin and De'Ja to "break free" of one another. Officer Rivera took Griffin to a nearby meeting room, and Barrera took De'Ja to another office.

Officer Rivera stated that he and Griffin were joined in the meeting room by his

2

partner, Officer Daniel Lopez, principal Kane,[2] and Barrera. Officer Rivera testified that Griffin "was still pretty visibly upset about the whole ordeal" and that he "explained to [Griffin] that because she committed [an] act of family violence in [his] presence . . . [he] would have to arrest her for that offense." Officer Rivera stated that Griffin told him that "she was not going to be arrested, she was not going to go anywhere with [him] and she wasn't going to do anything." Griffin stood up and attempted to walk out of the meeting room. Officer Rivera testified that he stood in front of the door and "put his hand up" to block Griffin's exit, and Griffin "started swinging" at him. As Officer Rivera stepped backward to avoid Griffin's swings, Officer Lopez intervened by stepping between Griffin and Officer Rivera. Officer Rivera testified that Griffin "raked" her fingernails across Officer Lopez's face and Officer Lopez "grabbed a hold of her and they went to the ground." Upon hitting the ground, Griffin continued to resist by kicking and screaming, prompting Officer Rivera, Kane, and Barrera to "grab a hold [of Griffin] until [Officer Lopez] finally got her calmed down and handcuffed." After Griffin was handcuffed, the officers sat her up and, though Griffin ceased to physically resist, she refused to identify herself.

*2. Barrera's Testimony*

Barrera testified that he was called over his radio about a parent, later identified as Griffin, walking around campus with a board in her hand and looking for her daughter. Barrera stated that he and Officer Rivera located Griffin and De'Ja in the gym. Officer Rivera approached and removed the board from Griffin's hand. Barrera testified that Griffin then began "assaulting" De'Ja by "hitting [De'Ja] with closed fists in the face, head area, really hitting [De'Ja] with a closed fist." Barrera and Officer Rivera had a "difficult time removing [Griffin] from [De'Ja]."

---

[2] The Carroll High School principal at the time of the incident is identified in the record only as "Kane."

3

Barrera escorted De'Ja to the campus police security room and then went to the meeting room where Officer Rivera had escorted Griffin. Officer Lopez came out of the room and told him that he was concerned that things were going to escalate because Griffin was not going to let them arrest her. Barrera stated that when Officer Lopez and he entered the room, Griffin and Officer Rivera were arguing, Officer Rivera stepped away and "[Griffin] immediately came towards Officer Lopez and immediately attacked him . . . ." Officer Lopez then "wrestle[d]" Griffin to the ground and, with Officer Rivera's assistance, attempted to handcuff her. Barrera "threw [him]self on [Griffin's] leg and [held] her legs down because she was kicking." Barrera testified that it took Kane, Officer Lopez, Officer Rivera, and himself to restrain Griffin so that she could be handcuffed.

*3. Officer Daniel Lopez's Testimony*

Officer Lopez testified that he was in the campus police security office when he received a call that "there was an assault in progress." Officer Lopez testified that the radio communications indicated that a woman had come onto campus through the back with no visitor's pass and was looking for her daughter. While scanning the surveillance cameras located throughout the school, Officer Lopez saw Officer Rivera and Barrera approach Griffin. Officer Lopez testified that he "saw [Officer] Jimmy Rivera grab a board from [Griffin]," and that he "observed [Griffin] start . . . throwing blows" at De'Ja. Officer Lopez left the office and accompanied Officer Rivera as he escorted Griffin to a nearby meeting room.

Officer Lopez stated that once in the meeting room, Officer Rivera told Griffin that he had to place her under arrest for family violence. Officer Lopez stated that Griffin retorted, "[n]o, you're not going to arrest me," began "yelling profanities," and started

4

walking to the door. He testified that Officer Rivera stepped in front of Griffin and Griffin "started throwing blows." Officer Lopez testified that he tried to stop Griffin by grabbing her around the shoulder area and Griffin struck him in the face. Officer Lopez testified that as a result of Griffin's strike, he sustained "[s]everal scratches that developed into large welts." He also testified that the welts caused pain and took several days to heal.

After being struck in the face, Officer Lopez "immediately took [Griffin] to the ground." Officer Lopez testified that his actions were necessary to gain control of Griffin and not to physically hurt her. After Griffin was on the ground, Officer Lopez continued to yell at her to comply but Griffin resisted until he threatened to mace her.

On cross-examination, Officer Lopez admitted that in his first statement, he did not mention that Officer Rivera removed a board from Griffin's hand. He also testified that Griffin appeared to be "breathing fine" when she was on the ground and that her breasts were not exposed during the altercation.

## B.    The Defense's Evidence

### 1. Wanda Griffin's Testimony

Griffin's mother, Wanda Griffin, testified that around 2:00 p.m. on May 10, 2006, she had a cell phone conversation with one of the officers involved in Griffin's arrest. Although Wanda was unable to identify the officer to whom she spoke, she testified that he did not tell her that Griffin was going to be arrested. She testified that the officer explained to her what had happened and that while she was on the phone, she heard "people talking and fumbling" in the background. At some point she heard one of the officers "screaming and hollering" and then heard Griffin let out a "death scream." Upon hearing Griffin, Wanda "started screaming and hollering and then nobody answered." Wanda testified that at that

point, she "knew [her] daughter was dead." When Wanda bailed Griffin out of jail around 4:00 a.m. on May 11, 2006, she noticed bruises on Griffin's back, neck, and inner thighs, and that Griffin's clothes were torn. Upon seeing Griffin's injuries, Wanda insisted that Griffin go to the hospital.

*2. De'Ja's Testimony*

De'Ja testified that on May 10, 2006, Griffin came to Carroll High School to pick her up for a doctor's appointment and discovered that she was skipping class. Griffin began searching for her and found her in the gym. Upon seeing Griffin, De'Ja "sass[ed]" her and Griffin "slapped" her. De'Ja testified that there were no officers around and that after being slapped, she "ran through the neighborhood." At some point, De'Ja returned to the school gym and went to her gym locker. Griffin found her in the dressing room and De'Ja ran into an adjoining hallway. De'Ja stated that at that point, Barrera and Officer Rivera arrived and Officer Rivera took a board out of Griffin's hand. De'Ja testified that Griffin grabbed her shirt but did not punch her. De'Ja also testified that it would have been impossible for Griffin to pull her hair because she was wearing a baseball cap.

De'Ja stated that she and Griffin were separated by Officer Rivera and Barrera, and that she was led to the police security office. While she was in the office, Kane came in and forced her to look at a surveillance camera that showed Griffin. She testified that Griffin's clothes were "hanging off and . . . her pants [were] unbuttoned and her ponytail was off [sic]."

*3. Griffin's Testimony*

Griffin testified that when she arrived at Carroll High School on the afternoon of May 10, 2006, she went through the front door of the school and asked to see De'Ja. Griffin

stated that the office called De'Ja's teacher to inquire about De'Ja, but the teacher replied, "She's skipping again." Griffin testified that she went to the police security office to ask for assistance in locating De'Ja and then "bumped" into De'Ja in the gym. Griffin asked De'Ja why she was skipping and De'Ja began "sassing" her. Griffin stated that she "slapped [De'Ja] in the face," and De'Ja "took off running."

Griffin testified that sometime later, she found De'Ja in the gym dressing room. Griffin stated that she "grabbed [De'Ja] by her shirt so she wouldn't run again," but denied punching De'Ja or grabbing her hair. Barrera and Officer Rivera arrived on the scene and led Griffin into a "dark room." Once in the room, she sat down, began to cry, and spoke to Kane. Griffin testified that during her conversation, Officer Lopez "was pacing behind [her] at the door walking back and forth . . . mumbling" and "kicking" chairs.

Griffin testified that no one told her that she was under arrest and she decided to go to her car. As she reached for the door, Officer Lopez "snatched [her] shirt and exposed [her] breasts." Then Officer Lopez "punched [her] in the forehead full of force and [she saw] stars." Griffin "staggered" and "shook it off." In an attempt to keep herself from being further exposed by her torn clothing, Griffin "pushed" Officer Lopez. Officer Lopez responded by "slamm[ing]" her onto the ground. Griffin testified that Officer Rivera, who was on the phone with Martha, dropped the phone and, accompanied by Kane and Barrera, began to "attack[ ]" her. As the men held her down, Officer Lopez "straddled" her and dealt "straight body punches to [her] head and face." Although Griffin "scream[ed] and holler[ed]," Officer Lopez "continued to choke [her] . . . [with] one hand . . . over [her] mouth and nose so [she] could not breathe . . . ." Griffin testified that Officer Lopez punched her and she "died for a few minutes." When she "woke back up," her pants were "off to [her]

7

knees," her shirt was open and her breast exposed; Griffin then "gave up." Kane covered Griffin's chest, pulled her pants up, wiped blood from her mouth, and helped her up. Griffin was handcuffed and lead to a police car. Griffin testified that on the walk out to the car, she witnessed Barrera, Officer Lopez, Officer Rivera, and members of the Corpus Christi Police Department "laughing" and "[g]iving high fives."

Griffin testified that upon reaching the jail, she was not given any medical treatment, and that, after being in jail for almost two days, she was released and went to the emergency room. Griffin testified that she was denied treatment at the emergency room and left because she was upset. However, on cross-examination, Griffin admitted that while she was at the emergency room, a CAT scan was conducted and the results came back normal.

On April 29, 2008, after being instructed on the justification of self-defense and the affirmative defense of duress, a jury convicted Griffin of the offense of assault on a peace officer. See TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1). The trial court later sentenced Griffin to two years' imprisonment. See id. § 12.42(a)(3) (Vernon Supp. 2009). This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

In her first and second issues, Griffin contends that the evidence is legally and factually insufficient to support her conviction in light of the evidence that she acted in self-defense or under duress. Additionally, Griffin asserts that the evidence is legally insufficient to support her conviction because Officer Lopez failed to lawfully discharge his official duties at the time of his altercation with Griffin.

## A.    Standards of Review and Applicable Law

8

*1. In General*

In reviewing the legal sufficiency of evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original)).  The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).  We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact.  *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).  We resolve any inconsistences in the evidence in favor of the judgment.  *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, a court of appeals reviews the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence.  *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).  Unless the record clearly reveals that a different result is appropriate, we must defer to the fact-finder's determination concerning what weight to be given to contradictory testimony.  *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *See Curry*, 30 S.W.3d at 404; *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). In the present case, under a hypothetically correct jury charge, the jury was required to find, beyond a reasonable doubt, that: (1) Griffin intentionally, knowingly, or recklessly caused bodily injury to Lopez; (2) Lopez was a public servant; (3) Griffin knew Lopez was a public servant; and (4) Lopez was lawfully discharging his official duties at the time of the assault. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1). Griffin does not dispute that she intentionally, knowingly, or recklessly caused bodily injury to Officer Lopez; instead, she maintains that by using "unlawful, unjustified force," Officer Lopez failed to lawfully discharge his official duties at the time of the altercation and that she acted in self-defense and under duress.

*2. Self-Defense*

When the challenge to the sufficiency of the evidence pertains to the rejection of a self-defense claim, we apply the same standards used in reviewing the sufficiency of the evidence to support a guilty verdict. *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (factual sufficiency); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (legal sufficiency).

Self-defense does not generally justify resisting an arrest that the actor knows is being made by a peace officer. TEX. PENAL CODE ANN. § 9.31(b)(2) (Vernon Supp. 2009).[3]

---

[3] The offense in this case occurred on May 10, 2006, and the legislature subsequently amended section 9.31. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 2, 2007 TEX. GEN. LAWS 1, 1 (codified as an amendment to TEX. PENAL CODE ANN. § 9. 31 (Vernon Supp. 2009)). Our analysis is governed by the prior version of section 9.31. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 5(a), 2007 TEX. GEN. LAWS 1, 2 (stating that an offense committed before the act's effective date is governed by the section in effect when the offense was committed); Act of May 29, 1993, 73rd Leg. R.S., ch. 900, § 1.01, sec. 9. 31, 1993 TEX. GEN. LAWS 3589, 3601 (current version at TEX. PENAL CODE ANN. § 9. 31).

However, the use of force to resist an arrest is justified:

> (1) if, before the actor offers any resistance, the peace officer . . . uses or attempts to use greater force than necessary to make the arrest . . . ; and

> (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's . . . use or attempted use of greater force than necessary.

TEX. PENAL CODE ANN. § 9.31(c).

*3. Duress*

Duress is an affirmative defense requiring the defendant to prove by a preponderance of the evidence that he "engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." *Id.* § 8.05(a) (Vernon 2003). A person is compelled to act within the meaning of the duress defense only if confronted by force or threat of force that would render a person of reasonable firmness incapable of resisting the pressure. *Id.* § 8.05(c).

We review the legal sufficiency of the evidence to support the jury's rejection of Griffin's affirmative defense under a two-part test. *See Cleveland v. State*, 177 S.W.3d 374, 387 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (en banc). First, we examine the record for evidence that supports the jury's rejection of Griffin's affirmative defense while ignoring all evidence to the contrary. *See id.* Second, if there is no evidence to support the jury's rejection of Griffin's affirmative defense, we examine whether the record supports Griffin's affirmative defense as a matter of law. *See id.* We review the factual sufficiency regarding Griffin's affirmative defense of duress by reviewing all of the evidence in a neutral light to determine whether the judgment rendered is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See id.* at 390.

**B.    Analysis**

The jury heard testimony that Griffin, with board in hand, confronted De'Ja near the school gym.  Officer Lopez, Officer Rivera, and Barrera testified that after Officer Rivera removed the board from Griffin, Griffin's behavior toward De'Ja escalated with slaps and punches that ended only when Barrera and Officer Rivera pulled them apart.  Testimony revealed that Officer Rivera and Officer Lopez, both uniformed campus police officers, took Griffin to a nearby meeting room and informed her that she was under arrest.  Griffin attempted to exit the room but was blocked by Officer Rivera.  The State presented testimony that Griffin responded by "swinging at [Officer Rivera]."  Testimony revealed that Officer Lopez intervened by stepping between Griffin and Officer Rivera, and that he was subsequently "attacked" by Griffin. The jury heard testimony that Griffin "thr[ew] blows" and "raked" her fingernails across Officer Lopez's face.  Officer Lopez testified that, in an effort to gain control of Griffin, he forced her to the ground.  Officer Lopez, Officer Rivera, and Barrera testified that it took four men to restrain Griffin so that she could be handcuffed.  Additionally, Officer Lopez and Officer Rivera testified that the amount of force used was necessary to effect Griffin's arrest.

Griffin testified that she did not punch De'Ja or grab her hair in the presence of Officer Rivera.  Griffin stated that once in the meeting room with the officers and school administrators, she attempted to speak to principal Kane, but Officer Lopez began behaving aggressively by kicking chairs and pacing behind her.  Griffin denied that she was told that she would be placed under arrest.  Griffin testified that, as she attempted to leave the meeting room, Officer Lopez used force greater than necessary to effect her arrest by (1) "snatch[ing her] shirt and expos[ing her] breasts," (2) "slamming" her onto the ground, (3) punching her so hard that she saw stars and "died for a few minutes," and (4) dealing "straight body punches to [her] head and face."

12

The jury is the sole judge of the credibility of the witnesses and may believe or disbelieve any part of a witness's testimony. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Lee v. State*, 259 S.W.3d 785, 792-93 (Tex. App.–Houston 2007, pet. ref'd). The jury was presented with one version of events in which Officer Lopez's actions toward Griffin escalated as her resistance escalated and another version in which Griffin endured an unprovoked attack by Officer Lopez. To the extent the versions conflicted, it was the jury's duty to resolve those conflicts. *See Lee*, 259 S.W.3d at 792-93. Moreover, Griffin's testimony is the only evidence raising the issue of self-defense, and the jury's decision to reject the claim ultimately hinged on Griffin's credibility. Because it was within the jury's province to resolve the disputed versions of the events in question, the jury was free to disbelieve the testimony supporting Griffin's self-defense claim. *See id.*

Additionally, the evidence supports the jury's rejection of Griffin's affirmative defense of duress. Although the jury was charged with duress, the State asserts that "[t]he law of duress is inapplicable to the present case because the law of duress implies third party compulsion, . . . not threat from the victim of the offense." Assuming, without deciding, that the law of duress is applicable in the present case, the jury could have reasonably rejected it. Griffin's testimony revealed that she felt that she was in imminent danger when she was on the ground "fighting for her life." However, the jury heard testimony that Griffin scratched Officer Lopez, thus causing him bodily injury, before he grabbed her and took her to the floor; only Griffin testified otherwise. Accordingly, the jury could have rejected Griffin's affirmative defense of duress by concluding that Griffin's actions were not compelled by threat of imminent death or serious bodily injury. *See* TEX. PENAL CODE ANN.

13

§ 8.05(a).

Viewing this evidence in the light most favorable to the verdict, there was evidence that Griffin intentionally, knowingly, or recklessly caused bodily injury to Officer Lopez, and that Officer Lopez was a public servant lawfully discharging his official duties. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1); *Laster*, 275 S.W.3d at 517-18. Viewing the evidence in a neutral light, we cannot conclude that the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or that the jury's verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15. We conclude that the evidence is legally and factually sufficient to support Griffin's conviction. Griffin's first and second issues are overruled.

### III. EXCULPATORY EVIDENCE

In her third issue, Griffin contends that the State withheld material exculpatory evidence. Specifically, Griffin argues that "[d]uring the punishment hearing, it was revealed that [Officer Lopez] had prior bad acts, which should have been given as *Brady* evidence to defense counsel prior to trial," because "[d]uring the trial, the truthfulness of [O]fficer Lopez's statement was attacked."

### A. Standard of Review and Applicable Law

In *Brady v. Maryland*, the United States Supreme Court held that the State must disclose evidence that is favorable and material to the defendant and is material to either guilt or punishment. 373 U.S. at 87; *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). To establish a *Brady* violation, a defendant must demonstrate that: (1) the State

suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material. *Harm*, 183 S.W.3d at 406. The defendant must demonstrate a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). *Brady* evidence includes information that is known to the State, but unknown to the defense. *United States v. Agurs*, 427 U.S. 97, 103 (1976). However, "*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist." *Harm*, 183 S.W.3d at 407 (quoting *Hafdahl v. State*, 805 S.W.2d 396, 399 (Tex. Crim. App. 1990)).

## B. Analysis

Griffin bases her contention that a *Brady* violation occurred on evidence supposedly revealed during the punishment hearing. Griffin supports her contention that "[d]uring the punishment hearing, it was revealed that [Officer Lopez] had prior bad acts" by pointing to the following testimony:

[Defense Counsel]: And during the trial you said something, when I asked you, "Were you still employed with the police department," you said, "No." And I asked you, "Why?" And you said, "Because of incidences [sic] like these." Would you please explain when [sic] you meant by that[?]

[Officer Lopez]: I believe I stated, you know, with all due respect, I arrested an individual and a couple of weeks later, a month later, I had to arrest them [sic] again for the same offense. I just got tired of it.

15

Neither Officer Lopez's testimony in its entirety, nor the above excerpt cited by Griffin as the sole support of her *Brady* argument, "reveal[ ] that [Officer Lopez] had prior bad acts." This testimony, though repeatedly cited by Griffin, fails to support her assertions that "Officer Lopez admitted to having a bad disposition with school security," or that Officer Lopez had a "highly volatile disposition as a disgruntled employee." Accordingly, we conclude that Griffin failed to demonstrate that the State suppressed evidence in violation of *Brady*. *See id.* Griffin's third issue is overruled.

## IV. PARENTAL RIGHT TO DISCIPLINE CHILD

In her fourth issue, Griffin contends that "[t]he assault charge was [an] improper infringement on the constitutional right of a parent to discipline her child." Citing Texas Penal Code section 9.61, Griffin argues that it was "error for the jury to conclude that she was not justified to question school police actions to the point where she had to fight for her life." Specifically, Griffin argues that she engaged in "reasonable discipline" of De'Ja and that the actions of campus police "were clearly unreasonable because they interfered with reasonable discipline under the circumstances."[4] We disagree.

Although Texas law recognizes the right of a parent to discipline her child, we fail to see how that right directly relates to the facts at hand. Section 9.61 sets forth a parental justification defense that is available when a parent uses non-deadly force against a child younger than 18 years "when and to the degree the [person] reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare." TEX. PENAL

---

[4] In her fourth issue, Griffin also asserts that she was "disrespected as a black parent in violation of her civil rights." Although Griffin makes this statement, she fails to make any argument or cite authority in support of this contention. As a result, we conclude that, to the extent that Griffin has raised a sub-issue regarding race in the Constitution, she has inadequately briefed this sub-issue. *See* TEX. R. APP. P. 38.1(i) ("The [appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

16

CODE ANN. § 9.61(a)(2) (Vernon 2003); *Quattrocchi v. State*, 173 S.W.3d 120, 122 (Tex. App.–Fort Worth 2005, pet. ref'd). In the present case, the non-deadly force at issue is not the force Griffin allegedly used against De'Ja, but rather the force used against Officer Lopez. Assuming, without deciding, that section 9.61 justifies the force used by Griffin toward De'Ja, such justification does not extend to justify her actions toward Officer Lopez. *See* TEX. PENAL CODE ANN. § 9.61. Because Griffin has failed to establish a violation of her constitutional rights, her fourth issue is overruled.

## V. MODIFICATION OF JUDGMENT

The trial court's judgment mistakenly recites Evelyn Louise Griffin's name as "Evelyn Louis Griffin." Because we have the necessary data and evidence for reformation, we modify the trial court's judgment to reflect the correct spelling of Griffin's name. *See* TEX. R. APP. P. 43.2; *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993).

## VI. CONCLUSION

Having overruled all of Griffin's issues on appeal, we affirm as modified the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
4th day of February, 2010.

17