Opinion filed March 31, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00074-CR

_____

## RODNEY GALE UNKART, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**
**Palo Pinto County, Texas**
**Trial Court Cause No. 13570**

### MEMORANDUM OPINION ON REMAND

The jury convicted Rodney Gale Unkart of one count of the manufacture of methamphetamine in an amount of four grams or more but less than 200 grams and one count of possession of methamphetamine, with intent to deliver, in an amount of four grams or more but less than 200 grams. The jury assessed Appellant's punishment at twelve years' confinement and a fine of $10,000 on each count. The

trial court sentenced Appellant accordingly and ordered that the sentences run concurrently. We affirm.

In an earlier opinion, we reversed Appellant's convictions in this case.[1] We held that the trial court committed fundamental error because it improperly commented on Appellant's right to remain silent, that the improper comments vitiated the presumption of innocence, and that the error was not harmless. Therefore, we sustained Appellant's first issue on appeal, and we remanded the case for a new trial. We did not rule on Appellant's other issue. Later, the Texas Court of Criminal Appeals held that the trial court's comments did not constitute fundamental error, that Appellant's motion for mistrial failed to preserve error on his claim because any harm caused by the trial court's comments could have been cured by an instruction to disregard, and that, in fact, any harm was cured by the totality of the trial court's instructions to the jury. *See Unkart v. State*, 400 S.W.3d 94, 96 (Tex. Crim. App. 2013). The Court of Criminal Appeals reversed the judgment of this court, and it remanded the case for us to resolve Appellant's remaining issue. *Id.* at 102.

Appellant contends in his second issue that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to Appellant's counsel before trial that it had entered into a plea agreement with a witness.

On July 7, 2006, Officer Cora Gray of the Parker County Special Crimes Unit and other police officers searched Appellant's house and surrounding property. When the officers arrived at the house, Jessica Pruitt was asleep in a bedroom. The State listed Pruitt as a witness, and she was sworn in as a State's witness with three other witnesses at the beginning of trial.

---

[1]*See Unkart v. State*, No. 11-10-00074-CR, 2012 WL 760798 (Tex. App.—Eastland Mar. 8, 2012), *rev'd*, 400 S.W.3d 94 (Tex. Crim. App. 2013).

As detailed below, the State presented extensive evidence in its case-in-chief that Appellant committed the offenses of manufacturing methamphetamine and possessing it with the intent to deliver as alleged in the indictment. During the first day of testimony, the State learned that Pruitt had used methamphetamine the previous night. The State advised the trial court that Pruitt had used methamphetamine, that she appeared to be under the influence of the drug, and that she was behaving "schizo." Thus, the State informed the trial court that it could not call Pruitt as a witness that day. The next morning, the State chose not to call Pruitt and rested its case-in-chief.

Appellant's counsel then chose to call Pruitt as a witness. Appellant's counsel met with Pruitt before she testified. In his opening statement, Appellant's counsel had told the jury that "Jessica Pruitt, if she testifies, will tell you she never saw [Appellant] cook dope [and] never saw him sell dope." On direct examination, Pruitt testified that she never saw Appellant manufacture or sell methamphetamine. During cross-examination by the State, Pruitt admitted that Appellant gave her methamphetamine and that she and Appellant used it together. She also testified that she saw items in Appellant's house that are used to manufacture methamphetamine. Pruitt denied, however, that she told Officer Gray that Appellant told her that he manufactured methamphetamine.

At that point, the State sought to introduce an audiotape of an interview that Pruitt gave to Officer Gray. The State did not produce the audiotape to Appellant's counsel before trial. The trial court excused the jury to allow Appellant's counsel and Pruitt to listen to the tape. After listening to the tape, Appellant's counsel informed the trial court that he had learned for the first time that Pruitt had accepted a plea deal from Officer Gray that required Pruitt to testify against Appellant. As part of the plea agreement, Pruitt agreed to plead guilty to a state

jail felony offense, and the State agreed to dismiss three pending felony charges against her.

Appellant had filed a pretrial motion to require the State to reveal any agreement it had with a witness that could influence that witness's testimony. In the motion, Appellant relied on *Giglio v. United States*, 405 U.S. 150 (1972). The trial court had entered an order granting the motion. Appellant's counsel stated that, "if the State had complied [with the court's order on any plea agreement] and [given him] notice of the deal [with Pruitt], [he] never would have called her as a witness." Appellant's counsel objected to the admissibility of the audiotape, requested the trial court to allow Appellant to withdraw Pruitt as a witness, and moved for a mistrial. The trial court reasoned that its order that required the State to disclose any agreement it had with a witness applied only to witnesses called by the State. Therefore, the trial court concluded that the order did not apply to Pruitt because the State had not called her as a witness. The trial court denied Appellant's motion for mistrial, ruled that the audiotape was inadmissible, and allowed Pruitt to continue testifying.

On further cross-examination, Pruitt admitted that she believed she told Officer Gray that Appellant manufactured methamphetamine. Pruitt said that Appellant asked her to sell methamphetamine for him.

Appellant re-urged his motion for mistrial after the close of the evidence. The trial court again denied the motion.

Appellant contends in his second issue that the State's failure to disclose its plea agreement with Pruitt violated *Brady*. To establish reversible error under *Brady*, a defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been

4

different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011); *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). Favorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence. *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006).

The third or materiality prong of *Brady* requires that the defendant be prejudiced by the State's failure to disclose the favorable evidence. *Id.* at 406. The question is not whether the defendant would more likely than not have received a different verdict with the undisclosed evidence but whether, in its absence, he received a fair trial—understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Pena*, 353 S.W.3d at 812 n.11. A "reasonable probability" that the outcome of the trial would have been different is a probability sufficient to undermine confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Higginbotham v. State*, 416 S.W.3d 921, 924 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The materiality of undisclosed information is not sufficiently proven by showing a mere possibility that the undisclosed information might have helped in the defense or might have affected the outcome of the trial. *Hampton*, 86 S.W.3d at 612. When evaluating whether the materiality standard is satisfied, we balance the strength of the undisclosed evidence against the evidence supporting conviction. *Id.* at 613.

The evidence showed that Officer Gray received a tip from a person who had been arrested on a drug charge that the person had purchased ingredients for making methamphetamine to take to Appellant's residence. Based on the tip, Officer Gray, Officer James Peel, and other officers went to Appellant's residence to conduct a "knock-and-talk" with Appellant. The officers contacted Appellant at his house. Officer Gray explained to Appellant that the police had received a

complaint that narcotics were being manufactured at his residence. Officer Gray asked Appellant whether the officers could look around his house and the property outside the house. Appellant gave his consent for the officers to look around.

Officer Gray and other officers went inside the house. Officer Peel and another officer stayed outside and searched in the barn area. Appellant told Officer Gray that he wanted to wake up a female who was asleep in the bedroom before the officers started their search. The officers agreed to Appellant's request, and they followed Appellant. Pruitt was asleep in the bedroom.

Appellant walked to a computer desk that was in the bedroom. He grabbed something that was on the desk. Officer Gray testified that there was a pipe used for smoking methamphetamine on the desk. Officer Gray asked Appellant what he had in his hand. Appellant opened his hand and showed Officer Gray two baggies of methamphetamine. Officer Gray seized the baggies from Appellant.

Officer Peel requested Appellant to walk around the property with him. Appellant agreed to the request. Appellant told Officer Peel that a lot of people came to his property. Officer Peel testified that he found evidence that he thought was related to manufacturing methamphetamine. Officer Peel asked Appellant about the evidence. According to Officer Peel, Appellant was "pretty quick to disassociate himself from that piece of evidence." Officer Peel told Appellant that "it was looking more and more like [Appellant] might be involved in the manufacture of methamphetamine." At that point, Appellant withdrew his consent to the search.

The officers stopped their search, detained Appellant and Pruitt, and secured the premises. Officer Gray left the house to obtain a search warrant for Appellant's property. She obtained a warrant and then returned to Appellant's residence. The officers then searched the house, a shed that was near the house, and Appellant's pickup that was parked in front of the house.

During the search, the officers found multiple baggies of methamphetamine, ingredients that are used to manufacture methamphetamine, and items that are commonly associated with the operation of clandestine methamphetamine labs. One of the officers took photographs of the evidence that was found. The officers provided detailed testimony about the "Nazi method" for manufacturing methamphetamine; the process used to manufacture methamphetamine; ingredients that are used to manufacture methamphetamine, such as ephedrine or pseudoephedrine, lithium metal, and anhydrous ammonia; other items that are commonly used in the manufacturing process, such as ether, starter fluid, lithium batteries, coffee filters, tubing, containers, and a hydrochloric acid (HCl) generator; and items that are commonly used in connection with the manufacture and distribution of methamphetamine, such as digital scales, baggies, and surveillance equipment.

The officers found surveillance equipment at Appellant's residence that made it possible for people inside the house to monitor what was going on outside. There were a number of surveillance monitors in the bedroom. Surveillance equipment is commonly used in connection with the operation of methamphetamine labs to detect the presence of law enforcement or potential thieves. The officers also found a scanner on the computer desk in the bedroom that could be used to monitor the activities of law enforcement. The officers found two guns near the computer desk in the bedroom. They also found a container in the bedroom that had two baggies of methamphetamine in it.

Pseudoephedrine may be extracted from Sudafed pills. The officers found multiple packages of Sudafed pills throughout the house. The officers found a black bag in the bed of Appellant's pickup. The black bag contained evidence of methamphetamine manufacturing, including numerous packages of lithium batteries and numerous baggies of methamphetamine. The black bag also

7

contained digital scales, needles, syringes, glass smoking pipes, additional plastic baggies, coffee filters, and a cutting agent that is used to add weight to methamphetamine. The presence of digital scales, which are used to weigh methamphetamine to package it for sale, indicated that Appellant intended to distribute methamphetamine. The officers testified that methamphetamine is commonly packaged for sale in plastic baggies. The officers also found a metal container that contained methamphetamine that was packaged for sale in baggies.

The officers found an HCl generator during their search. The neck of the bottle of the generator contained corrosive material, which Officer Peel testified was a byproduct of the process of manufacturing methamphetamine. The officers also found multiple starter fluid cans that had holes punched in them. Officer Peel said that starter fluid is ether, which is used in manufacturing methamphetamine. He explained that pure ether can be obtained by turning a can of starter fluid upside down and poking a hole in it to let all the pressure out of it. Officer Peel had seen "punched" starter fluid cans only in connection with methamphetamine labs.

In total, the officers found thirty baggies that contained methamphetamine. The baggies were taken to the DPS laboratory for testing. William L. Todsen, a forensic scientist with the DPS, tested the substances that were in the baggies. Todsen testified that each of the individual bags contained a substance that contained methamphetamine and that the total weight of the substances was 15.47 grams.

Appellant states in his brief that "Pruitt's testimony was devastating to an otherwise circumstantial case" because "[s]he was the only witness to testify with any alleged direct evidence of knowledge of Appellant's manufacture of methamphetamine." However, as summarized above, the State presented strong and compelling evidence of Appellant's guilt. The undisclosed evidence of Pruitt's plea agreement with the State was not exculpatory. Rather, it merely

8

constituted potential impeachment evidence that related to Pruitt's credibility as a witness. The State did not call Pruitt as a witness, and her testimony and credibility were not important to the State's case. The impact, if any, that the plea agreement had on Pruitt's testimony is unknown. Balancing the potential impeachment value of the undisclosed evidence against the evidence supporting Appellant's convictions, we conclude that there is not a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. Based on the evidence supporting guilt, we also conclude that there is not a reasonable probability that, had Appellant not called Pruitt as a witness, the outcome of the trial would have been different. Therefore, the undisclosed evidence was not material under *Brady*. Appellant has not shown that the State violated *Brady*. Appellant's second issue is overruled.

*This Court's Ruling*

We affirm the judgments of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


March 31, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.